UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ------------------------------------------------------------------- X
NEW YORK COMMUNITIES FOR CHANGE, on behalf
of Spanish and other Foreign Language Speaking Court
Users and Potential Court Users, and
LINDA BERGNES,
MANUEL CARVAJAL,
ROBERTO ISAZA,
GUADALUPE ORNELAS,
HECTOR TOMASI                                              **Case No. 22-4298(RA)**
TERESA VENDITTO,
GUADALUPE ALVAREZ,
CARLOS COLLAZO,
MARISOL CORNIELLE,                                         **FIRST AMENED**
JOSE ORTIZ ESCOBAR,                                        **CLASS ACTION**
RAFAEL FORTICH,                                            **COMPLAINT**
LAURA GONZALEZ,
KIMBERLY HERNANDEZ,                                        **JURY DEMAND**
HOE YEN LEE,
ARNOLD S. LEMUS,
RONALD E. LOPEZ,
JULIO LUCERO,
LUIS R. LUGO,
EDWARD C. LUK,
WANDA NEGRON,
DAVID B. OLSON,
OSCAR ORE,
SANDY RAND,
JULIO ROSA,
ALEKSANDRA SAGAN,
GLENYS SALDANA,
YANET SANTIAGO, and
MICHAEL SOFRONAS,
CYNTHIA VIAU,
on Behalf of Themselves and Classes
Similarly Situated,

                                    Plaintiffs,

                        v.

NEW YORK STATE UNIFIED COURT
SYSTEM/OFFICE OF COURT ADMINISTRATION,

                        Defendant.

 ------------------------------------------------------------------- X

Plaintiffs, by their undersigned counsel, as and for their Complaint (New York Communities for Change) and Class Action Complaint (all individual plaintiffs), allege as follows:

## INTRODUCTION

1.      This is an action by an organizational  representative of foreign-language court users, and a  class action lawsuit by court interpreters alleging that the New York State Unified Court System discriminates in its pay practices, as they apply to full-time Interpreters working in New York City, because those Interpreters are largely of non-United States national origin, either by birth or ancestry, are employees who associate with court users who are of non-United States origin, and because the New York Court system intentionally refuses to provide non-discriminatory language access to those who have difficulty speaking and hearing English. As a result, though highly skilled, those Interpreters are paid significantly less than all other courtroom personnel employed in New York City courts, because many of them are foreign born, are of foreign ancestry and because their skills are used to provide court access to non-English speaking, limited-English speaking individuals or persons with hearing disabilities. Additionally, as a consequence, non-English speaking court users are denied full and equal access to the court system.

## JURISDICTION

2.      This Court's jurisdiction is invoked pursuant to 28 USC §1331 and 42 USC § 1983. This Court's pendant jurisdiction is also invoked.

## PARTIES

3.      Plaintiff New York Communities for Change ("NYCC") is a not-for-profit membership corporation located Brooklyn, New York, which is a social justice organization

engaged in housing, climate justice, civil rights, and employment organizing  Its work is principally done in the Spanish-speaking community and a large number of its members are Spanish speakers. NYCC is an organizational plaintiff which sues on behalf of its members who are not primarily English-speaking.

4.      Linda Bergnes is an employee, as that term is defined in the New York State Human Rights Law ("NYSHRL"), employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Bergnes is employed in New York County working mainly in Family Court. Plaintiff Bergnes interprets for court users who speak Spanish

5.      Plaintiff Manuel Carvajal is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Carvajal employed in New York County, working mainly in Family Court. Plaintiff Carvajal interprets for court users who speak Spanish. Plaintiff Carvajal is of Hispanic national origin.

6.      Plaintiff Guadalupe Ornelas was, until September 2021, an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Ornelas is employed in New York County, working mainly in Family Court. Plaintiff Ornelas interprets for court users who speak Spanish. Plaintiff Ornelas is of Hispanic national origin.

7.      Plaintiff Roberto Isaza is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Isaza is employed in New York, Richmond, Kings, and Bronx County Family Court, working mainly in Family Court. Plaintiff Isaza interprets for court users who speak Spanish. Plaintiff Isaza is of Hispanic national origin.

8.      Plaintiff Hector Tomasi is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Tomasi is employed in Bronx County and mainly works in Criminal Court. Plaintiff Tomasi interprets for court users who speak Spanish. Plaintiff Tomasi is of Hispanic national origin.

9.      Plaintiff Teresa Venditto is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Venditto is employed in New York County, working mainly in Family Court. Plaintiff Venditto interprets for court users who speak Spanish.

10.     Plaintiff Guadalupe Alvarez is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Alvarez is employed in Suffolk County, working mainly in District Court. Plaintiff Alvarez interprets for court users who speak Spanish. Plaintiff Alvarez is of Hispanic national origin.

11.     Plaintiff Carlos Collazo is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Collazo is employed in Bronx County, working mainly in Supreme Court. Plaintiff Collazo interprets for court users who speak Spanish. Plaintiff Collazo is of Hispanic national origin.

12.     Plaintiff Marisol Cornielle is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Cornielle is employed in Bronx County, working mainly in Family Court. Plaintiff Cornielle interprets for court users who speak Spanish. Plaintiff Cornielle is of Hispanic national origin.

13.     Plaintiff Rafael Fortich is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Fortich is employed in Suffolk and Queens Counties, working mainly in Family Court. Plaintiff Fortich interprets for court users who speak Spanish. Plaintiff Fortich is of Hispanic national origin.

14.     Plaintiff Laura Gonzalez is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Gonzalez is employed in Orange County, working mainly in Family Court. Plaintiff Gonzalez interprets for court users who speak Spanish. Plaintiff Gonzalez is of Hispanic national origin.

15.     Plaintiff Kimberly Hernandez is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Hernandez is employed in Nassau County, working mainly in District Court. Plaintiff Hernandez interprets for court users who speak Spanish. Plaintiff Hernandez is of Hispanic national origin.

16.     Plaintiff Hoe Yen Lee is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Lee is employed in Kings County, working mainly in Family Court. Plaintiff Lee interprets for court users who speak Mandarin and Cantonese. Plaintiff Lee is of Chinese national origin.

17.     Plaintiff Arnold S. Lemus is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Lemus is employed in Nassau County, working mainly in

District Court. Plaintiff Lemus interprets for court users who speak Spanish. Plaintiff Lemus is of Hispanic national origin.

18.     Plaintiff Ronald E. Lopez is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Lopez is employed in Nassau County, working mainly in District Court. Plaintiff Lopez interprets for court users who speak Spanish. Plaintiff Lopez is of Hispanic national origin.

19.     Plaintiff Julio Lucero is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Lucero is employed in New York County, working mainly in Civil Court. Plaintiff Lucero interprets for court users who speak Spanish. Plaintiff Lucero is of Hispanic national origin.

20.     Plaintiff Luis R. Lugo is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Lugo is employed in Suffolk County, working mainly in Family Court. Plaintiff Lugo interprets for court users who speak Spanish. Plaintiff Lugo is of Hispanic national origin.

21.     Plaintiff Edward C. Luk is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Luk is employed in New York County, working mainly in Civil Court. Plaintiff Luk interprets for court users who speak Mandarin and Cantonese. Plaintiff Luk is of Chinese national origin.

22.     Plaintiff Wanda Negron is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office

of Court Administration. Plaintiff Negron is employed in Suffolk County, working mainly in District Court. Plaintiff Negron interprets for court users who speak Spanish. Plaintiff Negron is of Hispanic national origin.

23.     Plaintiff David B. Olson is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Olson is employed in Suffolk County, working mainly in Supreme Court. Plaintiff Olson interprets for court users who speak Spanish. Plaintiff Olson is of Hispanic national origin.

24.     Plaintiff Oscar Ore is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Ore is employed in New York County, working mainly in Family Court. Plaintiff Ore interprets for court users who speak Spanish. Plaintiff Ore is of Hispanic national origin.

25.     Plaintiff Sandy Rand is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Rand is employed in New York County, working mainly in Family Court. Plaintiff Rand interprets for court users who are deaf.

26.     Plaintiff Julio Rosa is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Rosa is employed in Kings and Bronx Counties, working mainly in Criminal Court. Plaintiff Rosa interprets for court users who speak Spanish. Plaintiff Rosa is of Hispanic national origin.

27.     Plaintiff Aleksandra Sagan is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm,

the Office of Court Administration. Plaintiff Sagan is employed in Kings County, working mainly in Criminal Court. Plaintiff Sagan interprets for court users who speak Polish. Plaintiff Sagan is of Polish national origin.

28.     Plaintiff Glenys Saldana is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Saldana is employed in Bronx County, working mainly in Criminal Court. Plaintiff Saldana interprets for court users who speak Spanish. Plaintiff Saldana is of Hispanic national origin.

29.     Plaintiff Yanet Santiago is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Santiago is employed in Queens County, working mainly in Family Court. Plaintiff Santiago interprets for court users who speak Spanish. Plaintiff Santiago is of Hispanic national origin.

30.     Plaintiff Michael Sofronas is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Sofronas is employed in Bronx County, working mainly in Family Court. Plaintiff Sofronas interprets for court users who speak Spanish. Plaintiff Sofronas is of Hispanic national origin.

31.     Plaintiff Cynthia Viau is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Viau is employed in Bronx County, working mainly in Criminal Court. Plaintiff Viau interprets for court users who speak Spanish. Plaintiff Viau is of Haitian and Dominican national origin.

32.     Plaintiff Jose Ortiz Escobar is an employee, as that term is defined in the NYSHRL, employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. Plaintiff Escobar is employed in Bronx County, working mainly in Family Court. Plaintiff Escobar interprets for court users who speak Spanish. Plaintiff Viau is of Hispanic national origin.

33.     Defendant New York State Unified Court System ("NYUCS") is a recipient of Federal Funds and is an employer as that term is defined in the NYSHRL. Its administrative arm is the Office of Court Administration ("OCA"). OCA's offices are located at 25 Beaver Street, Rm. 852, New York, NY 10004. NYUCS is a recipient of Federal Funds.

## CLASS ACTION ALLEGATIONS

34.     The Individual or Interpreter Plaintiffs, named in Paragraphs 4-32 above , bring their Equal Protection/Fourteenth Amendment and New York State Human Rights Law claims on behalf of a class of similarly situated employees, to wit, all full or part-time persons employed by the New York Unified Court System as Interpreters for the three years prior to the filing of this Complaint.

35.     A class action is appropriate because:

a.      each class is so numerous that joinder of all members is impracticable;

b.      there are questions of law or fact common to each class;

c.      the claims or defenses of the representative parties are typical of the claims or defenses of each class;

d.      the representative parties will fairly and adequately protect the interests of each class;

e.      inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing each class;

f.      adjudications with respect to individual members of each class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

g.      the parties opposing each class have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each class as a whole.

## FACTS RELEVANT TO ALL CLAIMS

36.      The Supreme Court of the United States has held that failing to take reasonable steps to ensure meaningful language access for limited English proficient ("LEP") persons is a form of national origin discrimination.[1] The United States Department of Justice's guidance[2] and subsequent technical assistance letters from its Civil Rights Division explain that court systems receiving federal financial assistance, either directly or indirectly, must provide meaningful access to LEP persons.

37.      The enactment of the Court Interpreter Act in 1978 is often cited as the seminal moment in the emergence and development of court interpreting as a profession.[3] Although the Act does not govern the state courts, it has served as the prototype for all subsequent language access laws and rules in the country. The Court Interpreter Act and all ensuing court interpreter canons are formulated in accordance with the standard of "legal equivalence," which demands that all Limited English Proficient (LEP) defendants have the right to be in a legal position equivalent to that of a native English speaker possessing a similar level of education and

---

[1] *Lau v. Nichols*, 414 U.S. 563 (1974).

[2] U.S. Department of Justice (2002). *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41 455.

[3] Susan Berk-Seligson. *The Bilingual Courtroom*. Second Edition (University of Chicago Press, 2017), 1.

intelligence.[4] This means that court interpreters have to interpret both idiomatically and verbatim, with due attention to the linguistic register of the speaker, and without omissions or embellishments.[5] This extremely ambitious standard has led to the ever-increasing professionalization of court interpreters over the 40 years since the Act became law. Nevertheless, at the same time that the State of New York and the profession in general have come closer and closer to realizing the ideal of legal equivalence (with the foreseeable consequence that the demand for court interpreters able to meet that standard has risen dramatically), compensation for interpreters in the state's court system, when adjusted for inflation, has stagnated.

38.     The notion that bilingualism in and of itself enables one to interpret is an unfortunate and persistent myth. Yet this notion is best dispelled by the fact that, of 1,075 approved applicants who participated in the 2015-2016 New York State Spanish court interpreter exam cycle, only 106 passed, or 10% of the total—and that only after the written and oral exams were graded on a curve to furnish enough candidates to allow the state to fill interpreter vacancies (before the curve, the number of successful examinees was dramatically lower). By way of comparison, the overall Certified Public Accountant (CPA) Exam pass rate hovers between 45% and 50%; 68% percent of the candidates for the New York State Bar Exam passed in 2017; and an average of around 90% of the U.S. Medical Licensing Examination (USMLE) non-foreign candidates to become practicing MDs passed in 2017. The fact that all of these professionals have to undergo rigorous formal training as a bar to taking the exam only underscores the fact that the 7% of interpreters who were able to pass the last test were, at

---

[4] Roseann Dueñas González, Victoria F. Vásquez, and Holly Mikkelson, *Fundamentals of Court Interpretation: Theory, Policy and Practice,* 2nd ed. (Durham: Carolina Academic Press, 2012), 14.

[5] *Code of Ethics*, 7.

minimum, bringing to the table the mastery of at least two languages in much more than their

legal vocabularies. Indeed, as New Jersey's "Overview for the Oral Examination for Prospective

Interpreters" states: "Court interpreters […] must be extraordinarily bilingual, possessing a

highly educated, native-like ability in both English and a second language."

    39.    Obviously, this goes beyond a mere highly educated bilingualism.[6] However, due

to the particular versatility required to accurately interpret multiple lexicons, it is, paradoxically,

only recently that interpreting has become an academic major or title, and that only at a few

universities. While the expertise has, of course, existed since the first societies began to interact,

the levels of ever-increasing specialization demanded to perform in more specific settings can

only be certified by experts in the respective subfield. So while many judiciaries with less

demanding exams also require that their court interpreters have a bachelor's degree of some

kind, others, such as New York, are principally concerned that applicants be able to pass an

examination designed by specialists in the field, while the educational requisite to take the exam

is a high school diploma. An unfortunate side effect of this approach is the assumption that this

---

[6] Language Services Section (LSS), Programs and Procedures Unit Office of Management and Administrative Services, Administrative Office of the Courts, "Overview of the Oral Examination for Prospective Interpreters," (Trenton: January 2019), 1, https://njcourts.gov/forms/10294_oralexam_appl.pdf

Simultaneous interpreting requires use of at least 22 cognitive skills at any given moment. Roseann Dueñas González, Victoria F. Vásquez, and Holly Mikkelson. *Fundamentals of Court Interpretation: Theory, Policy and Practice,* 1st ed. (Durham: Carolina Academic Press, 1991), 176.

See also New Jersey Courts, "Knowledge, Skills, and Abilities (KSAs) for the Profession of Court Interpretation," accessed February 2, 2019, https://www.njcourts.gov/public/assets/langSrvcs/ksa.pdf?cacheID=fxM2M7A

Just in terms of vocabulary, as the Federal Court Interpreters Orientation Manual sets out, "While court interpreting may appear to be a field that primarily requires knowledge of legal vocabulary, the subject matter to be interpreted is often quite diverse. In an average criminal trial, sophisticated legal arguments will be interpreted, as well as the testimony of handwriting, ballistics, fingerprint, chemical, DNA, and drug experts. Interpreters must have a broad active and passive vocabulary and an excellent knowledge of regionalisms, idioms and dialectical variations of the countries in which their language is spoken. Court interpreters must have these variations of language readily available due to the diversity of witnesses and defendants." Court Services Office, Administrative Office of the United States Courts, "Federal Court Interpreter Orientation Manual and Glossary," last revised May 8, 2014, 23.

means that New York court interpreters are only required to have a high school diploma and should be remunerated accordingly.

40.    In reality, however, most interpreters are highly educated. An anonymous survey conducted among its members by the Interpreters' Chapter of Local 1070 of District Council 37 of the American Federation of State, County, and Municipal Employees, the union that represents interpreters in New York City courts, found that of 70 respondents to the survey, 60 held degrees in higher education. Of the 60, 7 held Associates Degrees. 53 more held at least a Bachelor Degree, while of those 53, 14 had Master Degrees, one had a PhD, and 3 held JD degrees. The results of a second study conducted by the union among 40 interpreters in courts in New York County (about half the total interpreters in Manhattan courts) are even more emphatic: 36 advanced degrees, among them two Associate's, 34 Bachelors, 13 Masters, and one PhD.[7]

41.    Dispensing justice fairly, efficiently, and accurately should be a cornerstone of the judiciary. Court interpreters are necessary to secure the rights of deaf, hard of hearing and LEP persons who cannot be fully protected in legal proceedings unless qualified interpreters assist them. To that effect, the New York State Unified Court System (NYS UCS) has approximately 246 full- and part- time court interpreters in 20 foreign languages and American Sign Language.[8] Court interpreters work bi-directionally, from and into the English language, using the three modes of interpreting: simultaneous, consecutive and sight. Language industry surveys show that interpreters are a highly educated majority female and majority immigrant workforce.

42.    There are three levels of staff court interpreters in the New York State Courts: Court Interpreters, Senior Court Interpreters, and Principal Court Interpreters. Court interpreters

---

[7] Court Interpreter Chapter, AFSCME DC 37 Local 1070, "Interpreter Survey," questionnaire (New York: February 2018).

[8] New York State Unified Court System (2017). Ensuring Language Access: A Strategic Plan for Ensuring Language Access in the New York Courts, p. 5, annexed as Exhibit A.

are responsible for interpreting between English and a foreign language in the courtroom and other settings. Staff interpreters may also assist LEP persons in filling out forms, and may perform clerical tasks such as filing or answering inquiries, and other related duties.

43.     The Federal Judiciary sets a benchmark for both quality and compensation. In 2008, the Federal Judicial Conference (the national policy-making body for the federal courts) adopted a new "landmark standard" setting grade JSP-14 for all federal staff court interpreter positions.

44.     In 2008, the Judicial Conference of the United States (the national policy-making body for the federal courts) adopted the following policy as recommended by its Committee on Judicial Resources:

> Noting that staff court interpreter positions are highly specialized and present unique challenges for fitting into the new CPS salary progression policy due to the difficulties in making meaningful distinctions on the fundamental elements of the interpreters' work, the Committee recommended that the Conference approve the conversion of the staff court interpreter position from the CPS to the JSP, effective October 13, 2008. It also recommended the creation of a JSP landmark standard with a target grade of JSP-14 for all staff court interpreter positions and the establishment of a grade JSP-15 for supervisory court interpreter positions. The Conference adopted the Committee's recommendations.[9]

45.     Court interpreters in the New York State Unified Court System are paid substantially less than this federal benchmark because of the unlawful discriminatory approach defendant takes to paying them. This pay disparity does not exist for other job titles in the New York State Unified Court System. The last time that court interpreters were reclassified by the

_____

[9] Report of the Proceedings of the Judicial Conference of the United States.  September 16, 2008, p. 26.

Unified Court System was in 1994, when they were raised from a judicial grade of 16 to their current line 18.

| TITLE | SALARY RANGE | | NYS DIFFERENTIAL | |
|---|---|---|---|---|
| | NYS | Federal | Min Salary | Max Salary |
| Court Reporter | $81,254 – $131,923 | $91,511 – $105,237 | -11% | +25% |
| Court Clerk | $69,852 – $99,057 | $49,297 – $86,879 | +42% | +14% |
| Court Officer | $63,358 – $90,160 | $75,961[10] | -17% | +19% |
| Court Interpreter | $60,245 – $85,886 | $120,580 – $156,758 | -50% | -45% |

46.     Court interpreter compensation is also not in proper relationship to similar job titles in State service. The court reporter title, which is the closest group of professional employees to interpreters, provides another point of comparison and illustrates another significant disparity. Despite similarities in the nature of the job and skills required, a non-supervisory court interpreter in the NYS UCS earns 26% less than a non-supervisory court reporter at the entry level and 35% less at the top of the salary range. In Federal Court, maximum salaries for interpreters is 49% higher than top salaries for reporters.

47.     Important facts that illustrate deficiencies in the current job title and the unequal treatment of court interpreters:

- Advanced fluency in a second language—close to native speakers—is typically reached after seven and one-half years of learning the language. The NYS Office of Court Administration does not recognize much less quantify the acquisition of a second language as a qualification for the court interpreter title.

- Though the NYS UCS job title only requires a high-school diploma, industry surveys show that at least 76% of interpreters surveyed are, in fact, college graduates, post-graduates or doctoral graduates.

---

[10] Number based on what a federal security court officer, a private contractor, would make at $36.52 an hour for 40 hours a week times 52 weeks.

- The single most important qualification that court interpreters must have—passing the civil service exam (or the equivalent)—does not appear in the court interpreter job title.

- Risk factors unique to court interpreting are not properly accounted for by the NYS UCS. Interpreters work in potentially violent, stressful and high conflict environments, which have been documented to cause burnout, depression and/or vicarious trauma.

- Court reporters share several KSAs (Knowledge, Skills and Abilities) with court interpreters but many of these KSAs do not appear in the Court Interpreter job title. Indeed, the Court Interpreter KSAs—originally issued in 1986 and unchanged in the 1994 version—neither reflect current industry standards nor the actual qualifications required of New York's staff court interpreters.

- Court interpreting is a more demanding profession than court reporting due to the difference between the phonetic-bound translation performed by court reporters as compared with the culture-bound translation performed by court interpreters as well as the necessity of working in two languages rather than one.

- 55% of Court Reporting candidates pass the New York State Unified Court System's civil service exam whereas the pass rate for Spanish Court Interpreters is 10%.

- NYS UCS staff Court Interpreters are paid about half of what their federal counterparts are compensated, while the salaries for NYS UCS Court Reporters, Senior Court Clerks Court Officers, and Court Attorneys are not only comparable to those of their Federal counterparts but, in most cases, higher.

- While in the Federal Courts the compensation for the Court Interpreter title (JSP-14) is set higher than the Court Reporter title (comparable to JSP-12), the NYS UCS

compensates the Court Interpreter title (JG-18) much less than the Court Reporter titles (JG-24 to 27). The salary range for JSP-14 in 2019 was $120,580 – $156,758.

- The maximum Federal Court compensation for the Court Interpreter title is equal to that of a Law Clerk, while the maximum compensation for the Federal Court Reporter title is 33% less. In the NY Court system, Court Interpreters make 35% less than Court Reporters in maximum compensation.

- In order for NYS Court Interpreters to be treated equitably and consistent with the treatment of other job titles in NYS UCS, their salary grade would need to be reallocated from JG-18 to JG-31.

48.     Recent postings of job vacancies in the United States District Courts state that the salary range for the court interpreter position is JSP 11-14. However, a study published in 2016[11] found that Federal District Courts in the New York/New Jersey region hire court interpreters at the JSP-14 level because this is the entry-level position consistent with the Judicial Conference's policy. Even if hired as JSP 11s it takes only 3 years to become a JSP 14.

49.     Currently, NYS salaries for court reporter (JG-24 and JG-27), senior court clerk (JG-21) and court officer (JG-19) are not only comparable to those of their federal counterparts but, in most cases, higher.[12] In contrast, NYS court interpreters are paid about half of what their federal counterparts are compensated.

50.     This stark disparity in compensation is not based on a valid assessment of the skills, knowledge, experience and qualifications actually required to provide this critical service

---

[11] Robert Joe Lee and Francis W. Hoeber (Winter 2016). "Interpreter Compensation in the Courts: A Descriptive Study," in 31 COURT MANAGER 10. (The data for this finding are reported in Chapter Two of the United States Court Interpretation Database.)

[12] Federal "locality" rates in the NY-NJ-CT-PA region for Court Reporter (CR Level 1 – CR Level 4); Court Clerk (CL 25 – CL 26); and Court Interpreter (JSP 14). NYS salaries include a $4,200 "location" pay.

in the judicial system. It is based on the type of work interpreters do and the clients they associate with. Moreover, given that other positions in the New York State Unified Court System are compensated in line with or above Federal court compensation, the disparate treatment of court interpreters discriminates against this class of employees and results in mistreatment of and denial of equal access to those speaking languages other than English who are not being served by the most qualified interpreters due to the level of pay paid to interpreters.

**Federal Court Interpreter Compensation Benchmark**

51.     One of the key factors that drives the compensation of many job types is the degree to which the work is viewed to constitute a profession with standards of performance that must be demonstrated on a valid and reliable certification exam rooted in the profession's documented knowledge, skills and abilities (KSAs). Court interpretation is a profession that has been evolving for almost four decades, maturing from a service sometimes viewed as a necessary evil to a profession on par with long-established professions such as court reporting. Many studies have shown how up through the early 1980s court interpreters were often viewed and treated as glorified clerical personnel who were asked to do a job that "any bilingual person" could perform—with a corresponding low compensation. There were few standards and the few that existed were not based on empirical studies of the actual KSAs that the job entails. There was very little professional training available in either academic or non-academic contexts and no strong professional associations of court interpreters to promote professionalism.[13]

---

[13] To see the level of professionalism in one nearby state in the early 1980s, see the final report of the New Jersey Supreme Court Task Force on Interpreter and Translation Services, EQUAL ACCESS TO THE COURTS FOR LINGUISTIC MINORITIES. Trenton: Administrative Office of the Courts, 1985, especially pp. 82ff. and background reports 3, 7- 9, 12, 15, 16 and 22. For a historical overview, see Chapter 4, "The Profession of Court Interpretation," in Roseann Dueñas González, Victoria E. Vásquez and Holly Mikkelson, FUNDAMENTALS OF COURT INTERPRETATION: THEORY, POLICY, AND PRACTICE. Second edition. Durham: Carolina Academic Press, 2012.

52.     That state of affairs began to end when, after Congress passed the Court Interpreters Act of 1978, the Administrative Office of the United States Courts (AOUSC) embarked on developing a certification exam based on a robust study of the KSAs of court interpretation in the Federal trial courts. An interdisciplinary team of experts was assembled that traversed the country, conducting a thorough investigation of what judges and other legal professionals expected a competent interpreter to do, and then developed a certification process that would yield professionals who have demonstrated the ability to perform those KSAs.[14]

53.     The development of the Federal court interpreter certification exam had a significant impact on compensation. The best summary is provided by González et al.:

> In sum, the impact federal certification had on the professional status of court interpreters in an area that traditionally had been highly resistant to change was remarkable. The Government Service (GS) level of court interpreters prior to 1978 was 5 to 7, which translated to approximately $10,000 to $14,000 per annum. This pay level doubled after implementation of Public Law 95-539, when the starting salary for certified staff interpreters was elevated to GS 10, or $26,261 to $34,136 per year. An additional pay rate was instituted in 1985, which significantly increased both daily contractor rates—from $175 to $210 per day—and staff rates—to an entry level of GS 10 to 13. In 2000, the daily contractor pay rate was raised to $305 per day, while the staff rates increased to an entry level of JSP 11 to 14, or $57,408 to $125,695 per year. In 2010, daily contractor rates were at an all time high of $388 per day…, but staff starting pay remained in JSP 11 to 14 range…. Clearly, the value of the linguistic and interpreting skills for federal interpreters has increased tremendously over time.[15]

---

[14] Detailed descriptions of this massive endeavor are available in Etilvia Arjona, "The Court Interpreters Test Design," in L. Elías-Olivares, E.A. Leone, R. Cisneros and J.R. Gutiérrez, eds. SPANISH LANGUAGE USE AND PUBLIC LIFE IN THE UNITED STATES. Berlin: Mouton de Gruyter, 1985. pp. 185-200; Chapter 46, "Federal Certification," in González et al., supra; and Seltzer v. Foley, 502 F. Supp. 600 (S.D. NY 1980).

[15] Roseann Dueñas González, Victoria Vásquez, and Holly Mikkelson (2012). *Fundamentals of Court Interpretation: Theory, Policy and Practice*, 2nd ed., p. 173. Durham, N.C.: Carolina Academic Press.

**Qualifications and Testing**

54.     Both court reporter (JG-24) and court interpreter (JG-18) job title descriptions (see Exhibits B and C) include the requirement of a high school diploma or the equivalent. In addition, the court interpreter qualification provides an alternative to the high school diploma: an equivalent combination of education and experience or tested proficiency in English and another language.

55.     In contrast, both court reporter job titles (non-supervisory) require experience or experience and training:

- **Court Reporter (JG-24)** (Exhibit C) **:** "…three (3) years of general verbatim reporting experience or, graduation from a formal program in court reporting and two (2) years of general verbatim reporting experience."

- **Senior Court Reporter (JG-27)** (Exhibit D)**:** "One [1] year of permanent competitive class service as a court reporter; or Four [4] years of recent general verbatim reporting experience; or Successful completion of a program in general verbatim reporting from a recognized school and three (3) years of satisfactory full-time experience in general verbatim reporting."

56.     Since high school students do not acquire the ability to do stenographic reporting, it makes perfect sense to include a formal program and/or experience requirement for court reporters. The same holds true for Court Interpreters since high school graduates have surely not developed the requisite KSAs either. This shows how inapplicable the high school diploma qualification is for the profession of court interpretation.

57.     The JG-24 Court Reporter job title description and the JG-18 court interpreter job title description do not state that passing a performance test administered by the New York State Unified Court System, or any other entity, is a required qualification.

58.     The single most important qualification that both court reporters and court interpreters must have—passing their respective civil service exams (or the equivalent)—does not appear in the JG-18 court interpreter title description. Since current hiring practices require candidates for both professions to take and pass exams with two parts (knowledge plus performance). the respective job titles are largely incomparable.

59.     However, about half (55%) of JG-24 court reporting candidates pass the UCS Civil Service Exam,[16] whereas Spanish court interpreters pass at the much lower rate of 10%.[17] What conclusions can be drawn by comparing the scores of the two groups? This considerable difference in passing rates is an indicator that court interpreting is a more challenging profession than court reporting.

**Compensation**

60.     The New York State Unified Court System has set the maximum compensation levels for the Court Reporter titles (JG 24-27) consistent with Federal compensation and recognizing the KSAs required for the job.

61.     Federal court compensation for court interpreters is set significantly higher than for court reporters, and equal to that of Law Clerks.[18] In contrast, the New York State Unified Court System compensates interpreters much less than reporters.[19]

---

[16] New York State Unified Court System (2017). Court Reporter – Exam No. 45-796.

[17] New York State Unified Court System (2016). Court Interpreter (Spanish) – Exam No. 45-788.

[18] *Supra* note ___.

[19] *Id.*

| | | Salary Range | | Interpreter Salary Difference | |
|---|---|---|---|---|---|
| | | Min | Max | Min | Max |
| Federal | Interpreter | $120,580 | $156,758 | +32% | +49% |
| | Reporter | $91,511 | $105,237 | | |
| New York State | Interpreter | $60,245 | $85,886 | -26% | -35% |
| | Reporter | $81,254 | $131,923[20] | | |

**The Job Of Court Interpreter And Current NYS Job Title**

62.     New York State's current court interpreter title description was issued in 1986 and slightly amended in 1994. Even though the New York State Unified Court System has made some progress since then to expand and improve language access for parties in the court system,[21] the basic content of the NYS court interpreter job title has not been updated in thirty-six years. The current job title does not reflect the consensus of scholarship and practice in the field over all those years, leaving New York's court interpreter title outdated and inadequate.

**The Work Of Court Interpreters**

63.     To help the courts reach the goal of ensuring equal access to justice for all, court interpreters must possess native-like mastery in two languages as well as high level interpreting skills.[22] Court interpreters are required to accurately and faithfully reproduce what was spoken or signed in one language into another language without embellishment or omission, while preserving the language level and register of the speaker.[23]

---

[20] Combined range of JG-24 and JG-27 court reporter titles.

[21] The New York State Unified Court System implemented a strategic plan in 2006 to ensure quality language access in the UCS and issued reports in 2011 and 2017 on the progress and continuing implementation of the plan.

[22] Romberger, Wanda and William E. Hewitt (2006). "Wanted: Career Paths for Court Interpreters," p. 80 in *Future Trends in State Courts*. Williamsburg, Virginia: National Center for State Courts.

[23] New York State Unified Court System, *supra* note 6 at 7.

64.     In order to interpret accurately, interpreters must master both working languages' cultural context[24] and be able to prepare for specialized topics rapidly and routinely. To add to the complex nature of their job, interpreters must also know and use various forms of both working languages because they regularly work with a wide range of language users. Court interpreters interact with people with high levels of education and corresponding high levels of formal speech (e.g., judges, attorneys, and expert witnesses) as well as people with little to no formal education and corresponding highly informal ways of speaking.

65.     To interpret for such a broad range of speakers, an interpreter must have an ample repertoire of vocabulary and be able to handle language that ranges from subject-specific terminology to colloquialisms, regionalisms and slang. Moreover, to ensure the public's trust in the judiciary, court interpreters are required to observe high standards of professional conduct.[25]

**Court Interpreter Knowledge, Skills, and Abilities (KSAs)**

66.     The highly complex work of court interpreters requires the appropriate knowledge, skills and abilities to perform at the standards set by the UCS to ensure language access. There has been significant movement to describe the traits of a competent court interpreter and the nature of the job since the title description was issued in 1986 (though qualifications and KSAs remain unchanged since 1994). Other courts around the country have made significant inroads to identify the traits of a competent court interpreter. The Federal Courts recognize that the KSAs required of a court interpreter are highly complex.[26] The National Center for State Courts published the results of a nationwide assessment of court

---

[24] Interpreting: Getting it Right. American Translators Association. Accessed on October 23, 2018; United States Courts. Court Administration and Services Careers.

[25] New York State Unified Court System, *supra* note 6 at Appendix A.

[26] United States Courts. Court Interpreter Knowledge, Skills and Abilities. [For a full list of the federal court interpreter KSAs, contact the Administrative Office of the U.S. Courts.]

interpreting that took a comprehensive view of the profession, including a chapter entitled "Job Analysis and Position Descriptions for Professional Court Interpreters," in 1995.[27] A study of California's court interpreter certification exam conducted in 2007 identified a broad range of KSAs essential to court interpretation. The California Judicial Council applied the same KSAs in 2010 to evaluate the National Center for State Courts' certification exam.[28]

67.     Court interpreting is a developing profession, and even these well-founded KSAs in other court systems do not include all aspects of the job. For example, the ability to exercise professional judgment in a wide range of scenarios to comply with ethics standards is underrepresented. The Language Services Program manager for New Jersey's Administrative Office of the Courts recommended augmenting the California KSA's with additional skills and abilities that are vital to the day-to- day work of a court interpreter. These include exercising situational control (knowing how to handle impediments to performing interpreting duties), switching back and forth among the modes of interpreting appropriately, employing note-taking techniques and working effectively in a team of interpreters, among others.[29]

**Court Interpreter Testing**

68.     The New York State Unified Court System's *Strategic Plan for Ensuring Language Access* (Exhibit A) acknowledges that "assessing qualifications to serve as a court interpreter is critical to achieving a successful language access program."[30]

---

[27] William E. Hewitt (1995). Chapter 3 in Court Interpretation: Model Guides for Policy and Practice in the State Courts. Williamsburg, VA: National Center for State Courts.

[28] Judicial Council of California/Administrative Office of the Courts. (2007). *KSA's Essential for Court Interpretation*. [*See* Appendix 5] *Study of California's Court Interpreter Certification and Registration Testing*. Prepared by ALTA Language Services, Appendix 4 of *California's Assessment of the Consortium for Language Access sin the Courts' Exams*: Judicial Council of California 2010 report by ALTA Language Services, Inc.

[29] New Jersey AOC, Language Services Section, Office of Management and Administrative Services. Becoming an Arabic Court Interpreter, at Appendix A.

[30] *Ensuring Language Access*, *supra* note 3 at 11.

69.     Courts increasingly recognize that interpreters who have not been properly tested and trained almost certainly will have trouble understanding or accurately conveying important information, including a broad range of legal terminology,[31] and untrained bilinguals are a major risk in an interpreted encounter.[32]

**NYS Court Interpreter Testing**

70.     The *Ensuring Language Access* report on progress implementing the strategic plan concludes, "enhanced testing and assessment of prospective interpreters, including development of oral examinations in additional languages" is among the achievements of the 2006 and 2011 strategic plans on language access.[33] According to the Court System's Plan, the NYS UCS "has developed and administers a rigorous and comprehensive assessment program to evaluate the skills and qualifications of prospective interpreters."[34]

**Written and Oral Testing**

71.     For foreign language interpreters, a written English exam is a first step to qualify as a staff interpreter. The English proficiency exam is rigorous; typically 40% of candidates pass. Due to the high demand for Spanish and the number of Spanish staff interpreters hired, Spanish interpreters take a rigorous bilingual written exam.[35]

---

[31] U.S. Department of Justice (2016). Language Access in State Courts, p. 8. Civil Rights Division, Federal Coordination and Compliance Section.

[32] American Translators Association. Interpreting: Getting it Right.

[33] *Ensuring Language Access*, *supra* note 3 at 2.

[34] *Ensuring Language Access*, *supra* note 3 at 6.

[35] *Id*. at 6. ("There is a different process for testing and hiring of staff Spanish court interpreters. In light of the high demand for Spanish and the number of Spanish staff interpreters hired, the UCS has developed a competitive civil service examination. The two-part examination first requires candidates to pass a three-hour, multiple-choice test of their bilingual skills, probing candidates' grammar, vocabulary, word usage, sentence structure and reading comprehension, in both Spanish and English. The written test also assesses candidates' ability to translate from English to Spanish and Spanish to English. Candidates who pass this written examination qualify to take a one-hour oral examination, which includes viewing a video and interpreting everything spoken in Spanish to English and from English to Spanish, in simultaneous and consecutive modes. Final grades are based on performance on both the written and oral components of the examination, and candidates are ranked and selected for employment from an eligible list in compliance with state civil service law and rules.")

72.     Candidates who are successful on the written exam are required to take an oral exam to assess an applicant's ability to provide complete and accurate renditions going in both directions, between English and the other language, in three modes of interpreting: consecutive, simultaneous, and sight translation. Oral assessment examinations are required for all staff interpreter positions. Oral exams are given in 22 languages that account for eighty percent of the interpreting needs in the courts.[36] Interpreters for the deaf and hard of hearing must meet rigorous requirements of the Registry of Interpreters for the Deaf, Inc. (RID) the Chief Judge's recognized credentialing authority. Interpreters holding this credential may be placed on the NYS Registry of per diem court interpreters.

73.     The qualifications of American Sign Language interpreters employed by the court system are assessed by a different process. By statute, the Chief Administrative Judge must name one or more credentialing authorities to certify interpreters in American Sign Language to serve in the New York courts. See Judiciary Law § 390. The Registry of Interpreters for the Deaf ("RID"), a nationally recognized professional association that offers rigorous examinations and certifications, has been named as the credentialing authority for the New York courts. Section 390 also requires that the state provide interpreter services in all proceedings where a party or a witness is deaf and in all criminal proceedings in state-paid courts where the crime victim or any member of the immediate family is deaf.

**Test Outcomes**

74.     Many people believe that interpreting can be performed by almost anyone who is bilingual. The word "bilingual" covers a wide range of communicative competence. At one end is the person who has total mastery of two languages as a native speaker with high levels of

---

[36] Albanian, Arabic, Bengali, Bosnian/Croatian/Serbian, Cantonese, French, Greek, Haitian Creole, Hebrew, Hindi, Italian, Japanese, Korean, Mandarin, Polish, Portuguese, Punjabi, Russian, Spanish, Urdu, Vietnamese, and Wolof.

formal education in both languages. At the other end of the spectrum is the person who, while a "native speaker" of one language, has used that language only in informal situations such as family and work contexts and has completed limited formal education in that language, and is at an early stage of acquiring a second language.

75.     Professional interpreters are bilingual at the top end of that range both in terms of language usage and level of education. This is illustrated by two facts. First, university interpreting programs test applicants' language mastery in both languages since, without this foundation, there is no basis for teaching or learning interpreting skills. Second, all available statistics for court interpreting certification exams consistently show a high failure rate. One of the reasons for this is that anyone may take the tests. This open-access policy has been deemed essential due to the widespread lack of sufficient numbers of certified interpreters and the fear of using some educational or other prerequisite that might result in some false negatives, i.e., persons who could pass the test but that would be screened out by such prerequisites for which there is no empirical data to indicate their validity.

**Other Factors Relevant to Title Reclassification and Reallocation**

      **A.     Court Interpreter Classification as Professional**

76.     Courts across the United States have recognized that interpreters are "skilled professionals." The National Center for State Courts states that "interpreters are highly skilled professionals" who fulfill an essential role in the administration of justice.[37] The Administrative Office of the United States Courts holds that federally certified court interpreters are "highly

---

[37] William E. Hewitt (1995). Chapter 9, "Model Code of Professional Responsibility for Interpreters in the Judiciary," p. 199, in Court Interpretation: Model Guides for Policy and Practice in the State Courts. Williamsburg, VA:National Center for State Courts.

skilled professionals" who bring to the judicial process specialized language skills.[38] Considering the difficulty of court interpretation, the Virginia Court System maintains that a qualified court interpreter is therefore "a highly skilled, impartial language professional."[39]

77.    The Equal Employment Opportunity Commission has classified the job of interpreter as "professional" just as with the jobs of judge, lawyer and doctor.[40] The American Bar Association holds that the delivery of appropriate language-access services in legal proceedings depends upon the provision of competent and well-trained "professional" interpreters.[41] ASTM International, a recognized leader in setting private industry and government standards, also designates language interpreting as a "professional activity."[42]

## B.    Education

78.    Since court interpreters must be "equipped to understand the grammatically and syntactically complex language of the court—14th to 18th grade level (González, 1977)—and produce a meaningful legally equivalent interpretation with grammatical, structural, semantic, and pragmatic accuracy,"[43] it is unreasonable to expect that a high school graduate with no college education will be up to the task. Empirical data from the field shows that 86% of NYS staff court interpreters surveyed held degrees in higher education.[44]

---

[38] Administrative Office of the United States Courts, Court Services Office (2014). Federal Court Interpreter Orientation Manual and Glossary, Appendix 3: Court Interpreter Ethics and Protocol.

[39] Virginia Court System. Serving Non-English Speakers in the Virginia Court System: Guidelines for Policy and Best Practice, p. 3-2.

[40] U.S. Equal Employment Opportunity Commission. EEO-1 Job Classification Guide 2010.

[41] American Bar Association (2012). Standards for Language Access in Courts.

[42] ASTM International. *4.3 Characteristics of Interpreting.* Standard Practice for Language Interpreting.

[43] Dueñas González et al., *supra* note 16 at 21.

[44] Court Interpreter Chapter, Local 1070/AFSCME DC 37 (Feb., 2018). "Interpreter Survey." Questionnaire (N=70: HS diploma, 10; associate's degree, 7; bachelor's degree, 35; master's degree, 14; juris doctor degree, 3; PhD, 1).

79.    A study by InterpretAmerica demonstrated that the vast majority of North-American interpreters are college-educated, with 79% holding a bachelor's degree or higher.[45] A survey conducted by the Interpreters Division of the American Translators Association found 97% of its interpreters hold a college and/or a professional degree.[46]

### C.    Second Language Acquisition

80.    The Office of Court Administration neither fully recognizes nor quantifies what goes into the acquisition of a second language as a qualification for the court interpreter title. In order to succeed on a court interpreter exam, however, a person must already have acquired knowledge, practice and a combination of education and experience in a second language to develop the requisite proficiency level "equivalent to that of a native speaker," as required under the NYS court interpreter title.

81.    Many people who have taken four years of foreign-language courses cannot carry on a conversation in that language. Research in the field of second language acquisition shows that even students enrolled in immersion programs still produce non-native-like grammar when they speak, even after years of meaning-focused lessons in the second language.[47]

82.    Experts agree that advanced fluency in a second language requires years of immersion.[48] Stephen Krashen, one of the foremost scholars on second language acquisition

---

[45] Nataly Kelly, Robert G. Stewart, and Vijayalaxmi Hegde. (2010). *The Interpreting Marketplace: A Study of Interpreting in North America*. InterpretAmerica. (N=1,140.)

[46] ATA Interpreters Division (May, 2015). ATA Interpreters Division Report to ATA Board of Directors: Survey Results, Conclusions and Recommendations. (N=536: 34% of its interpreters hold an associate's and/or bachelor's degree while 63% have a master's and/or doctorate and/or professional degree.)

[47] Merrill Swain (1991). "French immersion and its offshoots: Getting two for one." In Freed, Barbara. *Foreign language acquisition research and the classroom*. Lexington, MA: Heath. pp. 91–103.

[48] Language immersion, or simply immersion, is a technique used in bilingual language education in which a native language and a second language are used for instruction in a variety of topics, including math, science, or social studies with the overall goal of promoting bilingualism and, in many cases, biculturalism.

(SLA),[49] divides the process of SLA into five stages: preproduction, early production, speech emergence, intermediate fluency, and advanced fluency.[50] The final stage is typically reached after between five and ten years of learning the language at a level "close to native speakers,"[51] or 7.5 years on average. However, reaching the "advanced fluency" stage does not necessarily meet the criterion of "native-like mastery" required to pass court interpreter exams and provide accurate interpreting in the legal setting. One can deduce, then, that developing native-like mastery in a second language requires a minimum of 7-10 years of immersion and practice in a second language.

### D.   The Work Is Stressful and Hazardous

83.     Hazards and risks related to employment. These include well-documented factors that can affect the quality and accuracy of the interpreter's performance: fatigue,[52] burnout,[53] depression[54] and vicarious trauma.[55] Working in close proximity with inmates, interpreting in

---

[49] Stephen Krashen (University of Southern California) is an expert in the field of linguistics, specializing in theories of language acquisition and development.

[50] The Room 241 Team (2012). Five Stages of Second Language Acquisition. Concordia University-Portland.

[51] Judie Haynes (2007). *Getting Started With English Language Learners: How Educators Can Meet the Challenge*. Alexandria, VA: Association for Supervision and Curriculum Development.

[52] Barbara Babbini Brasel (1976). *The Effects of Fatigue on the Competence of Interpreters for the Deaf* (after 30 minutes there is a slow but steady increase in error rate and after 60 minutes this increase becomes significant). *See also* Barbara Moser-Mercer (1998), Prolonged turns in interpreting: Effects on quality, physiological and psychological stress (provided evidence that prolonged turns lasting longer than 30 minutes have negative effects on the quality of an interpreter's output and on his attitude towards the task).

[53] Hans Zeier (1998). Psychophysiological stress research. Interpreting (analogous to a study on burnout behavior of some air-traffic controllers, mental overload in simultaneous interpreting may change the attitude to the job. It is less seriously taken, a certain carelessness occurs). *See also* Jorma Tommola and Jukka Hyönä (1990). Mental load in listening, speech shadowing and simultaneous interpreting: A pupillometric study (measured the variations in cognitive load during simultaneous interpreting and two other language processing tasks, listening and shadowing, by means of pupillometry and found that SI was associated with the highest dilation levels, associated with increased processing in the brain).

[54] Jin Ying (2008). The Conceptual Mapping Model in Consecutive Interpreting Teaching in *Learning Theories and Practice in Translation Studies* ("If the challenges caused by cognitive overload cannot be solved promptly, the interpreter can become increasingly anxious and depressed, which can strongly affect the quality of his/her performance," p. 4).

[55] Miranda Lai and Sedat Mulayim (2015). Vicarious Trauma Among Interpreters (21.36% reported that the emotional distress was so severe it reduced the perceived quality of their onsite interpreting performance).

stressful and high conflict situations, and interpreting related to trauma experienced by victims, witnesses and litigants in the UCS are features of the job that court interpreters regularly encounter and that need to be more fully considered in the training, classification and allocation for this job title.

## COURT INTERPRETERS ARE NECESSARY
## TO PREVENT LANGUAGE DISCRIMINATION

84.    In the end, the basic responsibility of the Office of Court Administration is the provision of unbiased, objective justice to the extraordinarily diverse population of the state of New York. In regard to language access, that responsibility is daunting. According to the Migration Policy Institute, almost 25% of New York City residents over the age of five (in a city of 8.5 million!) have limited English proficiency (LEP).[56] Not only that—one sixth of New York City households "contain no English-proficient adults over the age of 14."[57] What these statistics reveal is a huge group of people—or rather, a huge group of diverse communities—whose access to justice depends on the court system's ability to hire and maintain a large staff of qualified court interpreters (and this only in the five boroughs, without taking into account the considerable need for language access services in upstate courts). New York State has also made the legal commitment to provide an interpreter to any "party or witness, or interested parent or guardian of a minor party in a Family Court proceeding" as well as to any person "with limited

---

[56] Migration Policy Institute, "The Limited English Proficient Population in the United States," July 8, 2015, http://www.migrationpolicy.org/article/limited-english-proficient-population-united-states

Indeed, "according to the most recent federal census [...] nearly 30 percent of New Yorkers—two and a half million people—primarily speak a language other than English at home, a rate more than 50 percent higher than the national average, and over two million New Yorkers are not fluent in English at all." In Wendy N. Davis, "Justice Moves Slowly for Those Who Need Interpreters," *ABA Journal*, March 1, 2016, http://www.abajournal.com/magazine/article/justice_moves_slowly_for_those_who_need_interpreters

[57] Legal Services NYC, "Interpreting Justice: Language Access in the New York Courts," accessed February 2, 2019, http://www.legalservicesnyc.org/what-we-do/practice-areas-and-projects/civil-rights-initiative/interpretingjustice-language-access-in-the-new-york-courts/introduction

English proficiency seeking assistance at the court clerk's office."[58] In concrete terms this means that in New York State courts, interpreters interpret for witnesses, plaintiffs, defendants, and parents or guardians of minors at trials, conferences, and hearings; assist the clerk in providing information or receiving answers, motions, complaints, or any other judicial processes; interpret between attorneys and their clients in criminal, civil, housing, and family courts; and interpret between pro se litigants and opposing parties in housing and civil courts, among other duties.

85.     Despite this growing need, since 2009 the number of staff interpreters employed by the Office of Court Administration has dropped steadily, from 335 in 2009, to 270 in 2013, to 246 in 2014.[59] The number is likely lower today. The decline in personnel has not gone unperceived by court users and community stakeholders. A 2014 article in the New York Law Journal quotes the supervising attorney at MFY Legal Services as saying that "attorneys and their clients sometimes have to wait hours, or longer, for an interpreter to arrive."[60] A year later, former New York City Comptroller Scott Stringer found much the same thing. According to the Comptroller, "wait times for interpreters can often extend to many hours on any day, and…postponements of cases to another day because of a lack of interpretation services are not uncommon."[61] Even more recently, a 2017 report on language access by Legal Services of New

---

[58] PART 217, "Access to Court Interpreter Services for Persons with Limited English Proficiency," *Uniform Rules for N.Y. State Trial Courts*, effective June 1, 2016, http://ww2.nycourts.gov/rules/trialcourts/217.shtml

Judiciary Law - JUD § 390, "Equal access to court proceedings for deaf or hard of hearing person," accessed February 2, 2019, https://codes.findlaw.com/ny/judiciary-law/jud-sect-390.html

See also Title VI of the Civil Rights Act of 1964, SUBCHAPTER V—FEDERALLY ASSISTED PROGRAMS: §2000d. "Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin," accessed February 2, 2019, https://www.gpo.gov/fdsys/pkg/USCODE-2008-title42/html/USCODE-2008-title42-chap21-subchapV.htm. Several other federal and New York State interpreter canons exist.

[59] Christine Simmons, "Finding Court Interpreters Poses Challenge for State Courts," *New York Law Journal,* October 28, 2014, 3.

[60] "Finding Court Interpreters," 2-3.

[61] Scott Stringer, "Language Access in New York City Housing Courts," letter to Gail Prudenti, February 20, 2015, https://comptroller.nyc.gov/wp-content/uploads/2015/02/Prudenti-Housing-Court-Letter.pdf

York states that 74% of attorneys representing LEP clients had experienced interpreter-related adjournments.[62] Given the state's responsibility to serve the needs of LEP court users, in violation of Title VI of the Civil Rights Act of 1964, as well as state law and the rules of the New York State judiciary, the Unified Court System endangers the due process rights of LEP court users when it fails to provide adequate interpretation services.

86.     Language discrimination affects many Americans. LEP[63] persons are the group most frequently and severely affected by language discrimination. LEP individuals comprise a significant percentage of the population and are predominately people of color, particularly Latinos.[64] Nearly ten percent of the population in the United States is LEP.[65] That is approximately 29.5 million people.[66] There is a tremendous correlation between race and English-speaking ability in the United States. The vast majority, 87 percent, of LEP individuals are people of color.[67] That is about 25.67 million people of color, of which an estimated 21 million are Latino.[68] Despite popular perceptions to the contrary, many LEP individuals are United States citizens. A conservative estimate is that 13 million United States citizens are

---

[62] "Interpreting Justice," 10.

[63] In this essay, a LEP individual is defined as one who "[does] not speak English as their primary language and [has] a limited ability to read, speak, write, or understand English ... ."*Limited English Proficiency (LEP)*, LEP.GOV, http://www.lep.gov/faqs/faqs.html (last visited June 9, 2015).

[64] MIGRATION POLICY INST., DATA BRIEF: LIMITED ENGLISH PROFICIENT INDIVIDUALS IN THE UNITED STATES: NUMBER, SHARE, GROWTH, AND LINGUISTIC DIVERSITY 6 (Dec. 6, 2011), *available at* http://migrationpolicy.org/sites/default/files/publications/LEPdatabrief.pdf ("Most LEP individuals speak Spanish. Spanish-speaking LEP individuals accounted for 66 percent of the total US LEP population in 2010.").

[65] *Id.* at 1.

[66] *Id.*

[67] PEW HISPANIC CTR., TABLE 20: LANGUAGE SPOKEN AT HOME & ENGLISH- SPEAKING ABILITY, BY AGE, RACE AND ETHNICITY: 2009 {2011), *available at* http://www.pewhispanic.org/2011/02/17/statistical-portrait-of-hispanics-in-the- united-states-2009/2009-statistical-portrait-23/.

[68] Jasmine B. Gonzales Rose, Language Disenfranchisement in Juries: A Call for Constitutional Remediation, 65 Hastings L.J., 811, 814.

LEP.[69] Jeh Johnson's report on racial bias in the New York State Court system found that for litigants for which English is not a primary language. Full access to the court system was significantly impaired due to the insufficient number of interpreters. Jeh Johnson (2020) *Report from the Special Advisor on Equal Justice in the New York State Courts,* p. 28.

87.     English-language requirements and preferences exclude and subordinate LEP people, particularly Spanish-speaking Latinos, in a variety of contexts, including employment, education, domestic relations, access to healthcare and public services, and participation in democracy. For example, private employers have increasingly imposed "English-only" rules in workplaces, which have been applied to humiliate, discipline, and fire workers, as well as exclude LEP customers, especially Latinos.[70] In public schools, students' violations of English-only rules have resulted in Latino students being sent to "Spanish detention" or suspended simply for speaking Spanish on school grounds.[71] Some courts have even found speaking Spanish at home to be a form of child abuse and have threatened to remove custody from Latino parents unless they speak English to their children.[72] Furthermore, LEP individuals face significant barriers when it comes to accessing healthcare and public services.[73] Even the ability to exercise the fundamental right to vote can be inhibited when accommodations are not

---

[69] *Id.*

[70] *See* Garcia v. Gloor, 618 F.2d 264, 266 (5th Cir. 1980). Garcia, a bilingual employee, was fired for speaking Spanish in an English-only workplace. The Fifth Circuit upheld the "English-only" rule, finding it did not impose hardship upon Garcia because he was bilingual and capable of speaking English. *Id. See also* Pedrioli, supra note 5, at 97; Juan F. Perea, *Ethnicity and Prejudice: Reevaluating "National Origin" Discrimination Under Title VII*, 35 WM. & MARY L. REV. 805, 826--27 (1994) [hereinafter *Ethnicity and Prejudice*] (discussing how courts of appeal fail to recognize language restrictions in the workplace as a form of national origin discrimination).

[71] *Buscando America, supra* note 7, at 1443; Mirande, *supra* note 24, at 103.

[72] *Buscando America, supra* note 7, at 1445.

[73] Siddharth Khanijou, Note, *Rebalancing Healthcare Inequities: Language Service Reimbursement May Ensure Meaningful Access to Care for LEP Patients,* 9 DEPAUL J. HEALTH CARE L. 855, 857 (2005).

provided to LEP citizens.[74] Further, LEP citizens are routinely excluded from jury service in most jurisdictions.[75]

88.     LEP individuals are not the only people subject to language discrimination. Bilingual persons, particularly bilingual Latinos, are also affected. A recent study revealed that 38 percent of Latinos in the United States are "Spanish dominant, 38 percent are bilingual and 24 percent are English dominant."[76] This is not merely an immigrant issue. Nearly half of United States-born Latinos are not English dominant.[77] Widespread LEP language-based exclusions, coupled with accent and bilingualism discrimination, affect a large number of Latinos and other people of color in the United States but are often left out of discussions about race discrimination. Racial discrimination is often expressed differently against Latinos than against African-Americans. Most notably, language discriminations, which includes discrimination on the basis of actual or perceived English-language ability, bilingualism, and accent, is a common method of subordinating Latinos. For Latinos, language discrimination is not simply a linguistic issue; it is frequently a form of discrimination based on race or national origin. Language discrimination is challenging to address in the courts because English-language requirements are often viewed as race-neutral, even when they serve to exclude or subordinate Latinos and other non-English speaking minorities. Jasmine B. Gonzales Rose (2014). *Race Inequity Fifty Years Later: Language Rights Under the Civil Rights Act of 1964*. Alabama Civil Rights & Civil Liberties Law Review, vol. 6, pp.  167–212.

---

[74] Jocelyn Friedrichs Benson, *¡Su Voto Es Su Voz! Incorporating Voters of Limited English Proficiency into American Democracy,* 48 B.C. L. REV. 251 (2007).

[75] Gonzales Rose, *supra* note 68, at 815.

[76] PEW HISPANIC CENTER, WHEN LABELS DON'T FIT: HISPANICS AND THEIR VIEWS OF IDENTITY 4 (2012) *available at http://www.pewhispanic.org/files/2012/04/PHC-Hispanic-Identity.pdf.*

[77] *Id.*

89.     Title VI of the Civil Rights Act of 1964 and its corresponding regulations provide protection against language discrimination and require in many instances that LEP individuals be provided language interpretation in order to meaningfully participate in public programs and activities. Title VI provides that, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[78] Despite the lack of specific textual reference or mention of language in its legislative history, similar to the interpretation of Title VII, language discrimination has been recognized as a form of unlawful national origin discrimination under the Fourteenth Amendment.[79]

90.     On August 11, 2000, President William J. Clinton issued Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency."[80] Executive Order 13166 requires federal agencies to examine the services they provide, identify the need for these services to LEP persons, and develop an approach so that LEP persons have meaningful access to these services.[81] The Order also requires that federal agencies make efforts to ensure that recipients of federal financial assistance also provide meaningful access to their services.[82] Specifically, federal agencies are required to: (1) develop a plan that provides LEP individuals meaningful access to the agency's programs and/or services; (2) issue agency-specific guidance to bring the agency's programs/recipients of federal funds into compliance with Title VI, if the agency has not already done so; and (3) ensure that LEP individuals have input throughout the

---

[78] 42 U.S.C. § 2000d (2012).

[79] *DiMarco Zappa v. Cabanillas*, 238 F.3d 25 (1st Cir. 2001).

[80] Exec. Order No. 13166,65 Fed. Reg. 50121 (Aug. 11, 2000).

[81] *Id.*

[82] *Id.*

process.[83] Both Title VI protection against language discrimination and the requirement that language interpretation be provided to LEP individuals have been applied to ensure access to the courts.

91.     Applied to the courts, this four-factor test requires, among other things, that recipient courts ensure that LEP litigants and witnesses receive language assistance.[84]

> At a minimum, every effort should be taken to ensure competent interpretation for LEP individuals during all hearings, trials, and motions during which the LEP individual must and/or may be present. When a recipient court appoints an attorney to represent an LEP defendant, the court should ensure that either the attorney is proficient in the LEP person's language or that a competent interpreter is provided during consultations between the attorney and the LEP person.[85]

92.     The main resistance to providing interpretation to litigants and jurors are concerns about cost and accuracy.[86] These two concerns are closely related. Accuracy of interpretation can only be guaranteed if the interpreters are highly trained and certified. However, certified interpreters are in limited supply and require considerable financial investment.[87] It is significant, however, that the limited supply of certified interpreters is itself a result of language discrimination. Any challenges to securing certified court interpreters should be scrutinized with the understanding that the shortage or cost obstacles (since presumably costs would be lower if there were a larger supply) have actually been brought about by discriminatory language policies.

---

[83] *Id.*

[84] *Id.* at 41471.

[85] *Id.*

[86] Gonzales Rose, *supra* note 68, at 859.

[87] *Id.* at 862.

**Discriminatory Animus Is Rampant in the New York Court System**

93.     The disparity in pay is not, as we discuss above, skill based. It is based on a discriminatory attitude towards court interpreters—because they provide a service which is not in English, and because those they serve are non-English speakers or people with disabilities.

- It is customary for judges, court reporters and court clerks to a have desk inside a courtroom and in an office, but it is not so for court interpreters, who are mostly immigrant minorities, despite having our own code of ethics and being classified as professionals by the EEOC.

- In some courtrooms interpreters are the only staff to be seated outside of the well with the general public.

- When interpreters are "allowed" to sit inside the well of a courtroom, they are often told to sit in the jury box or a chair, and are not provided desk space even when a desk, or space to include a desk, is available.

- In one courtroom, a desk where interpreters were "allowed" to sit was taken out to make room for a closet for prosecutors to hang their coats, and interpreters were not provided an alternative designated desk space.

- In another courtroom, used food containers and utensils were left on a desk at which interpreters were "allowed" to sit. The day after an interpreter complained to courtroom management, the after-lunch mess was worse. The day after an interpreter complained to the court's upper management, the desk was removed from the courtroom.

- A sergeant told an interpreter to sit in the jury box and not at an unoccupied desk because people had to have a place to put their things (a water bottle, a purse, and a few court files).

- In one Supreme Court 18B Part, in May 2021 a judge referred to the court interpreters as "chattel;" a not as yet completed investigation was spurred by a complaint from the court interpreter who was present.

- One courthouse has had empty offices and cubicles with desks for years, but interpreters are not allowed to sit there just in case other staff may be hired in the future and we continue to share a one-person cubicle or use a break room as an office.

- Break rooms are prioritized for clerks and officers over office space for interpreters.

- Many staff interpreters are not provided computers with internet access despite the need for research into language usage available from countries worldwide, and interpreters must use their own laptop computers or cellphones to conduct research.

- In one court, staff other than interpreters are allowed to use their personal computers and cell phones, but interpreters must ask for permission to use their own devices to conduct work-related language research.

- Many staff interpreters are not provided with court telephone lines and must use their own cellphones for court business and operations without receiving reimbursement for their expenses.

- Some staff interpreters do not have general-access keys or specific-room keys that are provided to other staff, forcing interpreters to knock on doors or walk around portions of a building, even enter through a fire exit, to access their assigned workspace.

Many of these allegations were shared with  Special Advisor Jeh Johnson.

94.     When the NYSUCS sets compensation policies that do not show court interpreters the respect they should have as highly skilled professionals, and people see that job titles such as court clerks and stenographers are treated more professionally, it allows for enhanced anti-

immigrant and English-only discrimination to manifest itself rampantly throughout the New York State Courts.

95.     Jeh Johnson's 2020 report on racial bias in the New York State Unified Court System has shed light on "systemic and institutional language discrimination" against both court interpreters and the litigants interpreters serve. In one instance, his report discusses a court office had a sign that read, "No Interpreters Allowed." Another sign placed on the only desk outside of a courtroom well, read, "Interpreter Sits Here," and was accompanied by an illustration of a Mexican person sleeping (or rather taking a siesta) under a sombrero. In another office [says Johnson's report] in one courtroom court staff posted on a notice board a caricature of an interpreter as part of "Misfit Island," meant as an offensive reference to the Island of Misfit Toys. Court staff and judges sometimes call interpreters "interrupters." A court assigned a Spanish interpreter to an Italian-speaking-litigant. When the interpreter told the judge that the litigant spoke Italian, not Spanish, the judge responded, "that's basically the same thing, go on." The report on racial bias also mentioned that court staff incorrectly assume that an individual's inability to speak English means that the individual is unintelligent.

96.     The discriminatory pay practices in the Court system are a reflection of the discriminatory attitude towards court users who do not speak English, or who have disabilities.

97.     Plaintiffs incorporate the facts above into each cause of action set forth below

### AS AND FOR A FIRST
### CAUSE OF ACTION

98.     By acting as aforedescribed, Defendant, with respect to the Individual Plaintiffs, and members of Plaintiffs' Class, has violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, both because the majority of Court interpreters, unlike any other Office of Court Administration title, are a majority persons of a non-Anglo national origin,

and because they associate with and assist persons of non-Anglo national origins, and persons with disabilities.

## AS AND FOR A SECOND
## CAUSE OF ACTION

99.    By acting as aforedescribed, Defendant, with respect to the Individual Plaintiffs, and members of Plaintiffs' Class, has violated the New York State Human Rights Law Sections 296 (1) and (2) both because the majority of Court Interpreters, unlike any other Office of Court Administration title, are a majority persons of a non-Anglo national origin, and because they associate with and assist persons of non-Anglo national origins, or persons with disabilities.

## AS AND FOR A THIRD
## CAUSE OF ACTION

100.   By acting as aforedescribed, Defendant, with respect to non-English speaking persons who utilize the Court system in New York State has violated the Equal Protection Clause of the United States Constitution by depriving that population of equal access to the Court system.

## AS AND FOR A FOURTH
## CAUSE OF ACTION

101.    By acting as aforedescribed, Defendant, with respect to non-English speaking persons who utilize the Court system in New York State has violated the NY State Human Rights Law guarantee of equal accommodation by depriving that population of equal access to the Court system.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment:

a.      Declare that by their failure to lawfully pay salaries to court interpreters commensurate with their skills, and which bear a rational relationship to other court employees, because of their national origin, or because of their association with person of non-United States national origin, have violated the constitutional and statutory rights of the court interpreters and of those whom they serve.

b.      Adjusting the salaries of the Interpreter Plaintiffs and members of their class to a pay level commensurate with the knowledge, skills, and abilities which they bring to the job, at a significantly higher rate of pay, at a level which is not discriminatory because of their National Origin, association and assistance to persons of a non-Anglo National Origin, or because of their association with or assistance to persons with a hearing disability;

c.      Awarding the Interpreter Plaintiffs, and members of their class, the wages and benefits which they lost as a result of the Defendant's discriminatory actions;

d.      Awarding the Interpreter Plaintiffs emotional distress damages caused by the Defendant's discriminatory actions, determined at trial; and

e.      Awarding Plaintiffs attorneys' fees and costs, and such other relief as the Court finds equitable.

## JURY DEMAND

Plaintiffs demand a jury trial on all claims set forth herein.

Dated: New York, New York
September 30, 2022

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiffs*

By: ____/s/ *Arthur Z. Schwartz*____

Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400/917-923-8136
Email: aschwartz@afjlaw.com