UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK COMMUNITIES FOR CHANGE
and LINDA BERGNES, et al.,

                    Plaintiffs,

        v.

JOSEPH A. ZAYAS and CAROLYN
GRIMALDI,

                    Defendants.

No. 22-CV-4298 (RA)

<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

      Plaintiffs—the non-profit organization New York Communities for Change ("NYCC") and twenty-nine court interpreters employed in the New York State court system (the "Individual Plaintiffs")—bring this action pursuant to 42 U.S.C. § 1983 against Defendant Joseph A. Zayas, the Chief Administrative Judge of the New York State court system, and Defendant Carolyn Grimaldi, the court system's director of human resources. Plaintiffs allege that Defendants employ discriminatory pay practices in violation of the Equal Protection Clause of the Fourteenth Amendment. In particular, they assert that court interpreters, who are predominantly non-native English speakers, are significantly underpaid in comparison with other courtroom personnel in the New York court system, and that those pay disparities constitute unlawful discrimination on the basis of national origin. Now before the Court is Defendants' motion to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, the motion is granted.

**FACTUAL BACKGROUND**

The Court assumes the parties' familiarity with the factual background and procedural history of this action, as detailed in *New York Communities for Change v. New York State Unified Ct. Sys./Off. of Ct. Admin.*, 680 F. Supp. 3d 407 (S.D.N.Y. 2023) ("June 2023 Op."), and summarizes only the most pertinent facts below. The following facts are drawn from Plaintiffs' Second Amended Complaint and the attached exhibits which, on a motion to dismiss, the Court must assume to be true. *See, e.g.*, *Lynch v. United States*, 952 F.3d 67, 74-75 (2d Cir. 2020).

Plaintiff NYCC is a non-profit social justice organization engaged in "housing, climate justice, civil rights, and employment organizing," and its work is "principally done in the Spanish-speaking community." Dkt. No. 43 ("Second Am. Compl.") ¶ 3. The Individual Plaintiffs are each employed as New York State court interpreters who assist individuals who speak Spanish, Mandarin, Cantonese, or Polish, or who are deaf, in court proceedings. *Id.* ¶¶ 4-32. Twenty-five Plaintiffs interpret for Spanish-speaking individuals, two interpret for individuals who speak Mandarin and Cantonese, one interprets for Polish-speaking individuals, and one interprets for individuals who use American Sign Language. *Id.*

Defendant Joseph A. Zayas, the Chief Administrative Judge of the New York State court system, oversees the day-to-day operation of the court system, including its $3.3 billion budget and 15,000 employees. *Id.* ¶ 33. Defendant Carolyn Grimaldi is the director of human resources for the Office of Court Administration, which is the administrative arm of the court system. *Id.* ¶ 34. Defendants oversee the court system's "approximately 246 full- and part-time [c]ourt [i]nterpreters in 20 foreign languages and American Sign Language." *Id.* ¶ 41. These court interpreters, Plaintiffs assert, are "mostly immigrant minorities," *id.* ¶ 93, and "largely foreign born, or second generation from foreign born families," *id.* ¶ 61.

Plaintiffs principally allege that Defendants pay court interpreters "significantly less" than other courtroom personnel and that Defendants promote, preserve, and refuse to correct "discriminatory pay practices" throughout the court system "because those [i]nterpreters are largely of non-United States national origin, either by birth or ancestry." *Id.* ¶ 1.  Plaintiffs also assert that Defendants pay court interpreters at a salary range of $60,245 to $85,886, which is less than that of court reporters ($81,254 to $131,923), court clerks ($69,852 to $99,057), or court officers ($63,358 to $90,160).  *Id.* ¶ 45.  They argue that court interpreter compensation is thus discriminatory and "not in [a] proper relationship to similar job titles in State service." *Id.* ¶ 46.

In particular, Plaintiffs point to the "significant disparity" in pay between court interpreters and court reporters.  *Id.*  Court reporters, they assert, are "the closest group of professional employees" to interpreters.  *Id.*  Both court interpreters and court reporters require a high school diploma or equivalent, and the two roles share knowledge, skills, and abilities.  *Id.* ¶¶ 47, 54. Candidates for both positions are also required to pass civil service exams—a court interpreter exam and court reporter exam, respectively.  *Id.* ¶ 58.  Plaintiffs acknowledge that the court reporter position requires more experience and training than court interpreters, including either "three [] years of general verbatim reporting experience" or "graduation from a formal program in [c]ourt reporting and two [] years of general verbatim reporting experience." *Id.* ¶ 55.  But, they argue, court interpreting is a "more demanding profession" because of the "necessity of working in two languages rather than one," and because "[a]dvanced fluency in a second language … is typically reached after seven and one-half years of learning the language." *Id.* ¶ 47. Despite the "similarities in the nature of the job and skills required" between the two positions, Plaintiffs allege that court interpreters earn 26% less than court reporters because—unlike interpreters—court reporters "are mainly people who are not foreign-born, and transcribe 100% in English, servicing all users of the

Court system." *Id.* ¶ 46; *see also id.* ¶ 61 ("Court [r]eporters are largely Caucasian, and do not come from a foreign-born background.").

Plaintiffs allege that this pay disparity is based on a "discriminatory attitude" toward court interpreters because a "majority" of them are "persons of a non-Anglo national origin" and because they "provide a service which is not in English, and because those they serve are non-English speakers." *Id.* ¶¶ 93, 98.  According to the Second Amended Complaint, court interpreters are sometimes subjected to demeaning treatment during their employment: Plaintiffs allege, for example, that "in May 2021, a judge referred to the court interpreters as 'chattel.'"  *Id.*  Many interpreters, they assert, are not provided internet-accessible computers and some do not have the same keys provided to other staff, "forcing [i]nterpreters to knock on doors or walk around portions of a building, even through a fire exit, to access their assigned workspace." *Id.*  The complaint also cites a 2020 report on racial bias in the New York State court system, which described an instance where a judge assigned a Spanish interpreter to an Italian-speaking-litigant.  *Id.* ¶ 95. After the interpreter informed the judge of the mistake, the judge allegedly responded: "that's basically the same thing, go on."  *Id.*

## PROCEDURAL BACKGROUND

Plaintiffs brought this action on May 25, 2022, Dkt. No. 1, and filed the First Amended Complaint on October 5, 2022, Dkt. No. 19.  At that time, the sole Defendant was the New York State Unified Court System.  *Id.*  On June 28, 2023, this Court dismissed the First Amended Complaint in its entirety, holding that Plaintiffs' claims were barred by New York's sovereign immunity under the Eleventh Amendment.  *See* June 2023 Op.  Plaintiffs filed the Second Amended Complaint—the now operative complaint—on July 28, 2023, adding Defendants Zayas

and Grimaldi and removing all claims against the New York court system.  *See* Second Am. Compl.

In the instant complaint, Plaintiffs no longer bring any claims under NYSHRL, nor do they seek backpay for wages and benefits, or emotional distress damages.  *Id.*  They solely bring an action under 42 U.S.C. § 1983, alleging violations of the Equal Protection Clause and seeking both injunctive and declaratory relief.  *Id.*  The prayer for injunctive relief asks the Court to direct Defendants "to adjust the salaries of the Interpreter Plaintiffs and members of their class to a pay level commensurate with the knowledge, skills, and abilities which they bring to the job, at a significantly higher rate of pay, at a level which is not discriminatory." *Id.* at 41.  The prayer for declaratory relief requests that the Court "[declare] that Defendants … have violated the constitutional and statutory rights of the Court Interpreters and of those whom they serve."  *Id.*

Defendants now move to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See* Dkt. No. 56 ("Def. Br.").

## LEGAL STANDARD

Federal courts are "courts of limited jurisdiction and must independently verify the existence of subject-matter jurisdiction before proceeding to the merits." *Singh v. United States Citizenship & Immigr. Servs.*, 878 F.3d 441, 445 (2d Cir. 2017).[1]  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *see* Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113.  In resolving a Rule 12(b)(1) motion, a district court may refer to evidence outside the pleadings. *Id.*

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, emphases, and alterations.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To make that determination, the Court must "accept as true all factual allegations … but [is] not required to credit conclusory allegations or legal conclusions couched as factual … allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).

## DISCUSSION

In moving to dismiss the Second Amended Complaint, Defendants contend that (i) Plaintiffs' claims are barred by sovereign immunity, (ii) the Court should dismiss this action pursuant to the *Colorado River* abstention doctrine, (iii) NYCC lacks standing, and (iv) the Individual Plaintiffs fail to state a claim under the Equal Protection Clause. *See* Def. Br. at 8-19. Although the Court does not agree that the Eleventh Amendment bars this action or that it should abstain on *Colorado River* grounds, it shares Defendants' view that NYCC lacks standing and that the Individual Plaintiffs have failed to state a claim. It thus grants Defendants' motion and dismisses the Second Amended Complaint.

### I.    Subject Matter Jurisdiction

### A.  State Sovereign Immunity

Defendants first argue that state sovereign immunity deprives this Court of subject matter jurisdiction to hear the case. *See* Def. Br. at 8-10. The Court previously dismissed Plaintiffs' First Amended Complaint on this basis. *See* June 2023 Op. at 412-14. As explained there, the Eleventh Amendment generally bars suits against the States or their agencies in federal court, absent a

State's waiver of sovereign immunity or congressional abrogation. *Id.* Because the First Amended Complaint named just one defendant, the New York State Unified Court System—and because no waiver, abrogation, or other exception applied—the Court held that Plaintiffs' claims were barred by the doctrine of sovereign immunity. *Id.* at 409. In the Second Amended Complaint, Plaintiffs name two Defendants, Judge Joseph A. Zayas and Carolyn Grimaldi, and now argue that subject matter jurisdiction exists under the well-known exception to state sovereign immunity set forth in *Ex parte Young*, 209 U.S. 123 (1908).

Under *Ex parte Young*, "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007). This exception to sovereign immunity is a "judge-made remedy" that "reflects a long history of judicial review" of "unconstitutional actions by state … officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "It rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). As the Supreme Court has long reiterated, the doctrine allows the Fourteenth Amendment "to serve as a sword, rather than merely as a shield, for those whom [it was] designed to protect." *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). *Ex parte Young* thus "remains a landmark of American constitutional jurisprudence that operates to end ongoing violations of federal law and vindicate the overriding federal interest in assuring the supremacy of that law." *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007).

"To determine whether *Ex parte Young* applies to a complaint, [courts] conduct a straightforward inquiry into whether the complaint (1) alleges an ongoing violation of federal law

and (2) seeks relief properly characterized as prospective." *Silva v. Farrish*, 47 F.4th 78, 84 (2d Cir. 2022). First, the doctrine applies only when "a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past." *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986). Because "[a]n *allegation* of an ongoing violation of federal law is sufficient for purposes of the *Young* exception," a court's inquiry "does not include an analysis of the merits of the claim." *In re Deposit Ins. Agency*, 482 F.3d at 621. Second, "federal courts may hear claims for prospective injunctive relief" but not "retroactive claims seeking monetary damages from the state treasury." *Tsirelman v. Daines*, 794 F.3d 310, 314 (2d Cir. 2015). As the Supreme Court has noted, *Ex parte Young* must "reflect a proper understanding of its role in our federal system and respect for state courts," *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997), and the doctrine cannot overcome sovereign immunity "when the state is the real, substantial party in interest … as when the judgment sought would expend itself on the public treasury or domain, or interfere with public administration." *Stewart*, 563 U.S. at 255. The Eleventh Amendment thus forecloses "an award of money required to be paid from state funds that compensates a claimant for the state's past violations of federal law." *Morenz v. Wilson-Coker*, 415 F.3d 230, 237 (2d Cir. 2005); *see Green v. Mansour*, 474 U.S. 64, 68 (1985) (noting that, unlike "[r]emedies designed to end a continuing violation of federal law, … compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment"). Ultimately, "[t]he touchstone for determining whether certain relief is permissible under *Ex parte Young* is the prospective or retrospective nature of the relief sought." *Nat'l R.R. Passenger Corp. v. McDonald*, 978 F. Supp. 2d 215, 229 (S.D.N.Y. 2013), *aff'd*, 779 F.3d 97 (2d Cir. 2015); *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984).

Although the application of *Ex parte Young* can be "straightforward," *In re Deposit Ins. Agency*, 482 F.3d at 618, "in many cases the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* is not as clear cut as the brightness of high noon and the darkness of midnight," *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 375 (2d Cir. 2005) (citing *Edelman*, 415 U.S. at 667). In these cases, "[t]he general criterion for determining when a suit" can be brought under *Ex parte Young* "is the *effect* of the relief sought." *Pennhurst State Sch.*, 465 U.S. at 107; *see New York City Health & Hosps. Corp. v. Perales*, 50 F.3d 129, 135 (2d Cir. 1995) ("[I]t is the nature of that requested relief, not the label placed on it, which determines [the doctrine's] availability."); *Vega v. Semple*, 963 F.3d 259, 282-83 (2d Cir. 2020). If, for example, a plaintiff "frame[s] the relief it seeks in prospective terms" but the "effect of the relief sought is entirely retrospective," *McDonald*, 978 F. Supp. 2d at 229, then the State "is entitled to invoke its sovereign immunity from suit," *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d at 374; *see Stewart*, 563 U.S. at 256 (noting that courts are "willing to police abuses of the doctrine that threaten to evade sovereign immunity"). "In contrast, suits for injunctive relief," where "the prospective aim … is to end a continuing violation of federal law," can properly "overcome the compelling justifications for a state's sovereign immunity" and the *Ex parte Young* doctrine applies. 411 F.3d at 374-75.

In *Edelman v. Jordan*, a petitioner sought both prospective injunctive relief and equitable restitution against State officials. 415 U.S. at 653. The Supreme Court held that the suit was barred to the extent it sought "the award of an accrued monetary liability"—which was retroactive in nature—but the suit was proper with respect to the "payment of state funds … as a necessary consequence of compliance in the future with a substantive federal-question determination." *Id.* at 663-64, 668. As the Court explained, "[i]t is one thing to tell [a State officer] that he must

comply with the federal standards for the future … [but it] is quite another thing to order [him] to use state funds to make reparation for the past." *Id.* at 665. Now, over half a century later, it is "well-established" that "where an adverse effect on the state treasury is the necessary result of compliance with decrees which by their terms were prospective in nature, the Eleventh Amendment poses no obstacle." *Morenz*, 415 F.3d at 237; *see Vega*, 963 F.3d at 282 ("[R]elief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury."); *Milliken v. Bradley*, 433 U.S. 267, 288-89 (1977). Moreover, even if a violation "*stemmed* from a past wrong," the doctrine can apply if state officers "*continue[] to cause* constitutional violations." *Seneca Nation v. Hochul*, 58 F.4th 664, 671 (2d Cir. 2023).

Here, a straightforward reading of the complaint makes clear that Plaintiffs are suing state officials, acting in their official capacity, for "prospective, injunctive relief from violations of federal law." *Rowland*, 494 F.3d at 95. First, Plaintiffs allege an ongoing violation of federal law. They assert that Defendants presently enforce discriminatory pay practices, continuing to pay court interpreters at a lower salary scale ($60,245 to $85,886 per year) than their court reporter counterparts ($81,254 to $131,923) due to their national origin, in violation of the Equal Protection Clause. *See* Second Am. Compl. at 15, 41. Second, Plaintiffs seek relief properly characterized as prospective. In particular, they ask the Court to "[d]irect[] Defendants to adjust the salaries of the [i]nterpreter Plaintiffs" to "a pay level commensurate with the knowledge, skills, and abilities which they bring to the job … at a level which is not discriminatory." *Id.* at 41. And they do not seek "compensation for past wrongs" such as "lost wages, backpay, or retroactive benefits." *Rowland*, 494 F.3d at 98. Accordingly, the Court finds that Plaintiffs seek "prospective injunctive relief to end a continuing violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*,

411 F.3d at 370; *see Papasan*, 478 U.S. at 282 (holding that the expenditure of state funds to remedy a "present disparity in the distribution of the benefits from the State," in violation of the Equal Protection Clause, "is precisely the type of continuing violation for which" *Ex parte Young* applies).

To be sure, the relief that Plaintiffs seek may appear "indistinguishable in many aspects from an award of damages against the State," in that it "will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials." *Edelman*, 415 U.S. at 668. Nevertheless, in considering the "*effect* of the relief sought," *Pennhurst State Sch.*, 465 U.S. at 107—and "notwithstanding [its] direct and substantial impact on the state treasury"—the Court holds that Plaintiffs' requested relief "fits squarely within [*Ex parte Young*'s] prospective-compliance exception," *Milliken*, 433 U.S. at 289.  Indeed, cases seeking similar injunctive relief have been found to adequately state a claim under *Ex parte Young*.  In *State Employees Bargaining Agent Coalition v. Rowland*, for example, recently-terminated state employees sued state officials and sought "injunctive relief in the form of an order … compelling defendants … to reinstate [individual plaintiffs] to their former positions … or such other position as the Court deems appropriate, with full and appropriate restoration of seniority and benefits." 494 F.3d at 79.  There, the Second Circuit held that State sovereign immunity posed no bar to the suit because the plaintiffs sought prospective relief:

> [P]laintiffs' requested relief of reinstatement to positions that might no longer exist can hardly be characterized as "retroactive" or as seeking "accrued benefits." To the contrary, the relief would be entirely forward-looking inasmuch as it would require the state prospectively to rehire plaintiffs into existing positions or create *new* positions in the State workforce, and to compensate plaintiffs for work performed in the course of their *future* employment.  *See* [*Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 841 (9th Cir.1997)] (relying on fact that plaintiff "would be entitled to [a] salary solely for his work after reinstatement" to conclude that relief of reinstatement was prospective in nature).

*Id.* at 98.[2]  Similarly, in *Association of Surrogates and Supreme Court Reporters v. New York*, the Second Circuit directed a district court to enjoin a "lag-payroll law," which would have delayed the payment of employee salaries.  940 F.2d 766, 769 (2d Cir. 1991).  As the court there explained, requiring payments to the affected employees was a "purely prospective remedy," and the order's effect on the state treasury was "a permissible and … inevitable consequence of the principle announced in *Ex parte Young*."  *Id.*  Accordingly, given that Plaintiffs here seek prospective relief from alleged, ongoing constitutional violations—and not relief for a "past loss," *Seneca Nation*, 58 F.4th at 671—the Eleventh Amendment poses no bar to this suit.[3]

Finally, even where a plaintiff properly brings claims against defendants in their official capacities, *Ex parte Young* "only authorizes suit against officials with authority to provide the requested relief."  *Ndemenoh v. Boudreau*, 2023 WL 6122852, at *13 (S.D.N.Y. Sept. 19, 2023).  "In order for the exception to apply where a [c]omplaint seeks injunctive relief, it must therefore

---

[2] Although *Rowland* involved employees seeking reinstatement of previously-held positions, other courts have similarly found that they had subject matter jurisdiction over *Ex parte Young* suits seeking pay raises or changes to employee classification.  *See, e.g.*, *De Figueroa v. New York*, 403 F. Supp. 3d 133, 162 n.24 (E.D.N.Y. 2019) (holding that the "denial of [a] salary increase is an ongoing violation" and that a plaintiff's request for "salary relief qualifies as prospective injunctive relief"); *Wilkinson v. New York State*, 2019 WL 5423573, at *7-9 (E.D.N.Y. Oct. 22, 2019) (same); *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (allowing an *Ex parte Young* suit to proceed where employee plaintiffs requested an "injunction commanding [a] university [president] to raise their base salary to what it would have been had they not been discriminated against" under federal law); *Strong v. Grambling State Univ.*, 159 F. Supp. 3d 697, 706 n.4 (W.D. La. 2015), *aff'd*, 614 F. App'x 776 (5th Cir. 2015) (holding that an *Ex parte Young* suit "demands prospective relief, insofar as [plaintiff] requests that the court order that positions be … filled according to fairness, competency, qualifications, and that salaries be awarded based on qualifications and experiences"); *Patteson v. Johnson*, 787 F.2d 1245, 1249 (8th Cir. 1986) ("[Plaintiff] is entitled to prospective relief, including salary, accrual time for retirement vesting, and other benefits.").

[3] Plaintiffs also seek declaratory relief, requesting a declaration that "Defendants … have violated the constitutional and statutory rights of the [c]ourt interpreters."  Second Am. Compl. at 41.  This additional prayer for relief does not deprive the Court of jurisdiction under *Ex parte Young*.  *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 646 (2002) (noting that a "prayer for declaratory relief adds nothing to [a] prayer for injunction" even where a plaintiff "seeks a declaration of the past, as well as the future," as long as "no past liability of the State [or its officers] is at issue").

be alleged that the defendant has responsibility for the alleged conduct and the ability to redress the alleged violations." *Id.* In this case, Plaintiffs have alleged as much. Plaintiffs assert, for example, that Defendant Zayas "oversees the day-to-day operation of the Statewide Court system, including its $3.3 billion budget [and its] employees." Second Am. Compl. ¶ 33. They also allege that Defendant Grimaldi is the director of human resources for the Office of Court Administration, responsible for overseeing personnel administration, including the administration of benefits. *Id.* Plaintiffs claim, moreover, that Defendants "enforce[]" and "adhere[] to" "discriminatory pay practices," *id.* ¶ 96, "by their failure to lawfully pay salaries to [c]ourt [i]nterpreters commensurate with their skills," *id.* at 41. Plaintiffs thus adequately allege that Defendants "ha[ve] responsibility for the alleged conduct and the ability to redress the alleged violations." *Shollenberger v. New York State Unified Ct. Sys.*, 2019 WL 2717211, at *5 (S.D.N.Y. June 28, 2019); *see CSX Transp., Inc. v. New York State Off. of Real Prop. Servs.*, 306 F.3d 87, 99 (2d Cir. 2002). Accordingly, *Ex parte Young* permits jurisdiction over Defendants for prospective, injunctive relief.

**B. *Colorado River* Abstention Doctrine**

Defendants also argue that the Court should dismiss or stay this action under the *Colorado River* abstention doctrine because Plaintiffs have brought a parallel suit in state court. Def. Br. at 10. The Court declines to do so.

"The abstention doctrine comprises a few 'extraordinary and narrow exception[s]' to a federal court's duty to exercise its jurisdiction." *Woodford v. Cmty. Action Agency of Greene Cnty.,* Inc., 239 F.3d 517, 522 (2d Cir. 2001) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). Under *Colorado River* abstention, when there are concurrent actions in federal and state court, a federal district court "may abstain in order to conserve federal judicial resources only in exceptional circumstances." *Id.* To determine if the

doctrine applies, courts first consider if the concurrent proceedings are "parallel" such that "substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998). If parallel proceedings exist, courts then evaluate six factors:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed … and whether proceedings have advanced more in one forum than in the other, … ; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Woodford*, 239 F.3d at 522. The "balance [is] heavily weighted in favor of the exercise of [federal] jurisdiction," and "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Id.* "For example, with respect to the first *Colorado River* factor, the absence of a res point[s] toward exercise of federal jurisdiction," and, as to the second factor, "where the federal court is just as convenient as the state court, that factor favors retention of the case in federal court." *Id.* at 522-23. In conducting this inquiry, a court's task "is not to find some substantial reason for the *exercise* of federal jurisdiction … ; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the surrender of that jurisdiction." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 101 (2d Cir. 2012).

In this case, no such exceptional circumstances exist. Although Plaintiffs bring parallel proceedings in federal and state court, abstention may not be "based simply on an aversion to deciding an issue prior to a state court's adjudication." *Woodford*, 239 F.3d at 525 ("Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court."). Further, several *Colorado River* factors weigh in favor of retaining jurisdiction:

14

The controversy does not involve a res; the federal forum is no less convenient than the state forum; the federal suit was filed first; and federal law governs Plaintiffs' Equal Protection claims. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) ("[T]he presence of federal-law issues must always be a major consideration weighing against surrender.").

Defendants nonetheless argue that the danger of piecemeal litigation "strongly weighs in favor of abstention" because the Eleventh Amendment may bar the Court from considering all of Plaintiffs' claims. Def. Br. at 12. The Court, however, has already rejected Defendants' State sovereign immunity arguments, and the parallel state suit does not otherwise pose "a risk of inconsistent outcomes not preventable by principles of res judicata [or] collateral estoppel." *Woodford*, 239 F.3d at 524. Finally, while state procedures may well be adequate to protect Plaintiffs' federal rights, the balance of factors here is "heavily weighted in favor of the exercise of jurisdiction." *Id.* at 522. Accordingly, given that "only the clearest of justifications will warrant" abstention, *Moses H. Cone*, 460 U.S. at 16, the Court will not abstain on *Colorado River* grounds.

### C.  Standing of Plaintiff NYCC

Defendants next contend that Plaintiff NYCC lacks standing to bring this 42 U.S.C. § 1983 action on behalf of its members or on behalf of itself as an organization. Def. Br. at 13. The Court agrees.

"Article III standing is a bedrock constitutional requirement." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "For a plaintiff to get in the federal courthouse door and obtain a judicial determination … , the plaintiff cannot be a mere bystander, but instead must have a personal stake in the dispute." *Id.* at 379. Thus, to establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury

likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380.

In this Circuit, "an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983" because the rights that § 1983 secures are "personal to those purportedly injured." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). Plaintiff NYCC thus lacks standing to bring this § 1983 action as the representative of its members. *See League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984) ("Neither [the] language nor the history [of § 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members.").[4]

Plaintiffs appear to argue that the NYCC can nevertheless "independently satisfy" the requirements of Article III "and bring suit by itself." *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020). As the Court of Appeals has explained, "nothing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing." *Nnebe*, 644 F.3d at 156. "To bring a Section 1983 suit, … an organization must … show that the violation of its members' rights has caused the organization to suffer an injury independent of that suffered by its members." *Poole*, 922 F.3d at 74. In other words, the organization must satisfy the injury-in-fact prong of standing "without

---

[4] Plaintiffs cite *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, et al., v. Brock*, 477 U.S. 274 (1986), for the general proposition that an "association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Id.* at 511; *see* Dkt. No. 63 ("Pl. Br.") at 42. *International Union*, however, did not involve claims under 42 U.S.C. § 1983, and the Circuit has squarely rejected Plaintiffs' organizational-standing argument. *See, e.g.*, *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 788 F. App'x 85 (2d Cir. 2019) ("[O]rganizational plaintiffs … do not have standing to assert claims under 42 U.S.C. § 1983 on behalf of their members."); *New York State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 74-75 (2d Cir. 2019) ("In a string of opinions, this Court has held that organizations suing under Section 1983 must, without relying on their members' injuries, assert that their own injuries are sufficient to satisfy Article III's standing requirements.").

relying on [its] members' injuries." *Id.* at 75.  To do so, NYCC must plausibly allege that it has "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Moya*, 975 F.3d at 129.  "[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Nnebe*, 644 F.3d at 157.  But that impairment must still be concrete and particularized. *Moya*, 975 F.3d at 129; *see Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (noting that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III").  "This showing can be met by identifying some perceptible opportunity cost that the organization has incurred because of the violation of its members' rights." *Poole*, 922 F.3d at 75.

Plaintiffs assert that NYCC is "a not-for-profit membership corporation" and "social justice organization engaged in housing, climate justice, civil rights, and employment organizing." Second Am. Compl. ¶ 3.  NYCC works "in the Spanish-speaking community and a large number of its members are Spanish speakers." *Id*.  Plaintiffs also allege that Defendants "deprive[d] … plaintiff NYCC … of equal protection of the law," *id.* ¶ 33, because the lower pay of court interpreters "results in mistreatment of and denial of equal access to those represented … by NYCC, who speak languages other than English who are not being served by the most qualified [i]nterpreters," *id.* ¶ 50.

NYCC does not plausibly allege, however, that it has suffered a concrete, particularized, and actual or imminent injury-in-fact *independent of* that suffered by its members. *Poole*, 922 F.3d at 74.  It does not, for example, allege that Defendants' actions require "the expenditure of [NYCC] resources that could be spent on other activities" or that there exists "some perceptible opportunity cost expended by" NYCC. *Nnebe*, 644 F.3d at 157.  Nor does it assert that the

"substantial expenditure of resources" has frustrated its "mission," *Moya*, 975 F.3d at 130, or otherwise allege that Defendants' conduct "increases demand for [its] services," *Hous. Rts. Initiative v. Compass, Inc.*, 2023 WL 1993696, at *9 (S.D.N.Y. Feb. 14, 2023) (citing *Poole*, 922 F.3d at 75). NYCC has thus failed to "clear [the] hurdle[]" of identifying a concrete harm "without relying on [its] members' injuries" to satisfy standing. *Poole*, 922 F.3d at 74-75. Without plausibly alleging any "perceptible impairment" of its activities, *Nnebe*, 644 F.3d at 157, NYCC lacks standing to bring this suit.

No party contests, however, that Linda Bergnes and the other Individual Plaintiffs do have standing to bring this action. Because the Individual Plaintiffs allege that Defendants have engaged in "discriminatory pay practices," undercompensating them due to their national origin, Second Am. Compl. ¶ 96, they satisfy the requirements of Article III standing. In other words, they allege that they have "suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like … money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023). Indeed, courts routinely hold that subject matter jurisdiction exists where plaintiffs allege disparate-pay claims under § 1983. *See, e.g.*, *Hernandez v. Kellwood Co.*, 2003 WL 22309326, at *1 (S.D.N.Y. Oct. 8, 2003); *Xanthakos v. City Univ. of New York*, 2020 WL 5026930, at *3 n.3 (S.D.N.Y. Aug. 24, 2020). And because "at least one plaintiff has standing, [this] suit may proceed" to the merits. *Biden v. Nebraska*, 143 S. Ct. at 2365.

## II.    Individual Plaintiffs' Equal Protection Claim

Lastly, Defendants argue that Plaintiffs have failed to state a claim. The Individual Plaintiffs bring a § 1983 claim against Defendants for violating their constitutional right to equal protection under the Fourteenth Amendment. They primarily allege that Defendants' decision to

underpay court interpreters relative to other courtroom personnel constitutes unlawful discrimination on the basis of national origin.  *See* Second Am. Compl. ¶¶ 1, 46-50, 98-99. Defendants argue that Plaintiffs fail to state a pay discrimination claim because they do not allege a materially equivalent comparator group and fail to plausibly allege an inference of discrimination.  *See* Def. Br. at 16-18.  The Court agrees with Defendants.

At its core, the Equal Protection Clause "requires that the government treat all similarly situated people alike."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). To enforce this right, public employees bringing equal protection claims may bring suit pursuant to 42 U.S.C. § 1983.  *See Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019).  Together, "§ 1983 and the Equal Protection Clause protect public employees from various forms of [national-origin] discrimination, including … disparate treatment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *see Basak v. New York State Dep't of Health*, 9 F. Supp. 3d 383, 389-91 (S.D.N.Y. 2014).  Disparate treatment, in this context, occurs when a defendant intentionally discriminates against an employee because of their protected class, which can include their national origin.  *See Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015).

"[O]ne way an employer might discriminate against an employee because of her [national origin] is to pay her less than her … peers who perform equal work." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019).  To bring a disparate-treatment discrimination claim based on disparate pay, a plaintiff must plausibly allege "(1) that [s]he [is] a member of [the] protected class; (2) that [s]he [is] paid less than similarly situated employees who are not members of the plaintiff's protected class; and (3) evidence of discriminatory animus." *Simpson v. Metro-N. Commuter R.R.*, 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006).  On a motion to dismiss, a plaintiff need only "demonstrate circumstances giving rise to an inference of discrimination," which she can do "by

alleging that [s]he was treated less favorably than similarly situated employees of other … national origins." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 229 (2d Cir. 2014).  To succeed on such a claim, however, a plaintiff must plausibly allege that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* at 230.  A plaintiff is not obliged to show disparate treatment of an "identically situated employee," but "those employees must have a situation sufficiently similar to [the] plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

"Employees are not similarly situated merely because their [job responsibilities] might be analogized." *Simpson*, 2006 WL 2056366, at *7.  "Instead, to be similarly situated, employees must be substantially similar as to specific work duties, education, seniority, and performance history, all of which affect an employee's rate of pay." *Id.*; *see United Prob. Officers Ass'n v. City of New York*, 2022 WL 875864, at *8 (S.D.N.Y. Mar. 24, 2022) ("To perform equal work for purposes of a pay discrimination claim, individuals must perform the same job requiring the same effort and responsibility and under similar working conditions."); *see Rose v. Goldman, Sachs & Co., Inc.*, 163 F. Supp. 2d 238, 242 (S.D.N.Y. 2001) (noting, in the Equal Pay Act context, that a plaintiff "must show that the two positions are substantially equal in skill, effort and responsibility"); *Setlech v. United States*, 189 F.3d 462, 1999 WL 668118, at *3 (2d Cir. 1999) (finding that the plaintiff, an English professor, was not "similarly situated" to math or science professors).

Here, Plaintiffs fail to plausibly allege that they are "similarly situated in all material respects" to any comparator group.  *Brown*, 756 F.3d at 229.  Although they assert that court reporters are "the closest group of professional employees" to court interpreters, Second Am.

Compl. ¶ 46, they do not plausibly allege that the two positions share work duties, educational requirements, or working conditions.  To the contrary, the complaint acknowledges that the court reporter position requires applicants to pass a separate civil service exam, *id.* ¶ 58, as well as more formal training, including at least two years of court reporting experience, *id.* ¶ 55.  Plaintiffs also do not assert that court interpreters share job responsibilities with court reporters; instead, they highlight the differences "between the phonetic-bound translation performed by [c]ourt reporters as compared with the culture-bound translation performed by [c]ourt [i]nterpreters."  *Id.* ¶ 47.  Moreover, *Grubic v. Los Angeles Superior Court*, 2009 WL 10698377 (C.D. Cal. Dec. 21, 2009), is instructive here.  In *Grubic*, the court concluded, under similar circumstances, that a plaintiff did not state a pay discrimination claim because she "fail[ed] to sufficiently allege that the other [court] employees, such as court reporters, perform[ed] substantially the same work, or work of comparable value," as court interpreters.  *Id.* at *5.  Plaintiffs here, too, fail to plausibly allege that they are paid less than "similarly situated employees who are not members of [their] protected class."  *Simpson*, 2006 WL 2056366, at *7.[5]

Even if Plaintiffs could show that court reporters are similarly situated to court interpreters, they also fail to plausibly allege "circumstances giving rise to an inference of discrimination," *Brown*, 756 F.3d at 229.  Plaintiffs argue that they have done so because their allegations are "principally statistical" and that "statistics alone may be sufficient to warrant a plausible inference of discriminatory intent."  Pl. Br. at 44.  But "to show discriminatory intent in a[n] … Equal Protection case based on statistics alone, the statistics must not only be statistically significant in

---

[5] Plaintiffs also compare themselves to federal court interpreters, who they assert earn more than their State counterparts.  *See* Second Am. Compl. ¶ 45.  For the purposes of their disparate-pay claim, however, this comparison is inapposite.  Not only do Plaintiffs fail to allege that federal court interpreters are "peers who perform equal work," *Lenzi*, 944 F.3d at 110, but they do not even suggest that Defendants play any role in setting federal court interpreter salaries.  This comparison thus does not plausibly assist Plaintiffs in stating a disparate-treatment discrimination claim.

the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015); *see Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001), *abrogated on other grounds by Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Plaintiffs have not met this burden, as they offer no direct evidence of discriminatory intent but only vague statistics and conclusory allegations, which are "insufficient to support plausibly the key intentional conduct element of Plaintiffs' federal discriminatory treatment claim." *Raymond v. City of New York*, 317 F. Supp. 3d 746, 762 (S.D.N.Y. 2018); *see also Altidor v. Med. Knowledge Grp. LLC*, 2023 WL 6124019, at *4 (S.D.N.Y. Sept. 16, 2023) (rejecting a pay discrimination claim where the plaintiff gave only "a vague breakdown of the racial makeup of the defendant company"). Plaintiffs allege that Defendants oversee 246 court interpreters, Second Am. Compl. ¶ 41, the "majority" of whom are "persons of a non-Anglo national origin," *id.* ¶ 98; *see id.* ¶ 93 ("Court [i]nterpreters … are mostly immigrant minorities."). They also allege that court reporters are "largely Caucasian," *id.* ¶ 61, and "mainly people who are not foreign-born," *id.* ¶ 46. Generalities aside, however, Plaintiffs provide no concrete statistics about courtroom personnel broken down by national origin, ethnicity, race, ancestry, or otherwise. *Cf. Burgis*, 798 F.3d at 70 (holding that the plaintiffs' statistics were insufficient because they "show[ed] only the raw percentages of White, Black, and Hispanic individuals at each employment level, without providing any detail as to the number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level"). Accordingly, Plaintiffs' vague statistics are not "of a level that make[] other plausible non-discriminatory explanations very unlikely." *Id.* at 69. By providing no statistics about court interpreters or any comparator group—either in percentages or numbers—Plaintiffs thus fail to

make a "factual proffer sufficient to push Plaintiffs' claim over the line from possible to plausible." *Raymond*, 317 F. Supp. 3d at 761.

The anecdotal evidence that Plaintiffs offer to show that their pay "is based on a discriminatory attitude" toward court interpreters because of national origin, Second Am. Compl. ¶ 93, is further insufficient to state a claim. To be sure, it is certainly troubling that one judge allegedly referred to court interpreters as "chattel" and that another knowingly assigned a Spanish interpreter to an Italian-speaking litigant. *See id.* ¶¶ 93-95. Also concerning are the allegations that court interpreters are treated less professionally than court reporters and that they lack access to the dedicated workspaces, computers, and general-access keys provided to other staff. *Id.* But these examples do not, without more, plausibly allege that Defendants' pay decisions were motivated by discriminatory animus on the basis of national origin. *See Brown*, 756 F.3d at 230. Plaintiffs aver, in a conclusory fashion, that "[t]he discriminatory pay practices in the Court system, enforced and adhered to by defendants Zayas and Grimaldi, are a reflection of [a] discriminatory attitude." Second Am. Compl. ¶ 96. But none of these examples plausibly allege that Defendants Zayas or Grimaldi played any role in Plaintiffs' mistreatment, and Plaintiffs do not otherwise assert that Defendants directed or had knowledge of the alleged systemic discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85, 89 (2d Cir. 2015); *Littlejohn*, 795 F.3d at 314; *Richards v. City of New York*, 2021 WL 4443599, at *7 (S.D.N.Y. Sept. 28, 2021) (holding that allegations of discriminatory remarks by a "co-worker who was not involved in [p]laintiff's termination" did not plausibly allege discriminatory animus without "a causal connection between the remark and his termination"); *Saunders v. New York Convention Ctr. Operating Corp.*, 2022 WL 3577773, at *6 (S.D.N.Y. Aug. 19, 2022).

Ultimately, Plaintiffs challenge one specific form of discrimination: Defendants' decision to pay court interpreters at a lower rate than court reporters and other courtroom personnel, allegedly on the basis of national origin. However, as discussed above, Plaintiffs do not allege a materially equivalent comparator group; they fail to plausibly allege that this practice constitutes intentional discrimination on the basis of national origin; and they offer no direct evidence or statistics that "make[] other plausible non-discriminatory explanations very unlikely." *Burgis*, 798 F.3d at 69. Indeed, several plausible, non-discriminatory explanations for the pay disparity exist, such as differences in formal training requirements and job responsibilities. *See id.* ("For all that one can tell from the [complaint], it is equally possible [that defendants' actions were taken] for valid, non-discriminatory reasons."). Accordingly, Plaintiffs do not plausibly state a § 1983 pay-discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Complaint is granted. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. No. 54 and close this case.

Dated:    August 12, 2024
          New York, New York

Hon. Ronnie Abrams
United States District Judge